**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-3989

_____

RACE TIRES AMERICA, INC.,
a Division of Specialty Tires of America, Inc.;
SPECIALTY TIRES OF AMERICA, INC.;
SPECIALTY TIRES OF AMERICA (PENNSYLVANIA),
INC.;
SPECIALTY TIRES OF AMERICA (TENNESSEE), LLC,

Appellants

v.

HOOSIER RACING TIRE CORP;
DIRT MOTOR SPORTS INC,
d/b/a World Racing Group

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-07-cv-01294)
District Judge: Hon. Terrence F. McVerry

_____

Argued April 14, 2010

BEFORE: FISHER, and COWEN, <u>Circuit Judges</u>
and DITTER\*, <u>District Judge</u>

(Filed: July 23, 2010)

Mark K. Dausch, Esq.
Joseph Decker, Esq. (Argued)
Alan B. Rosenthal, Esq.
Mark D. Shepard, Esq.
Babst, Calland, Clements & Zomnir
Two Gateway Center, 6th Floor
Pittsburgh, PA 15222

Thomas M. Schultz, Esq.
Polymer Enterprises
Suite 401
4731 Route 30
Greensburg, PA 15601

Counsel for Appellants

_____

\*Honorable J. William Ditter, Senior United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.
Donna M. Doblick, Esq.

2

Reed Smith
225 Fifth Avenue
Pittsburgh, PA 15222

Donald E. Knebel, Esq. (Argued)
Kendall Millard, Esq.
Deborah E. Pollack-Milgate, Esq.
Aaron M. Staser, Esq.
Barnes and Thornburg
11 South Meridian Street
Suite 1313
Indianapolis, IN 46204

Counsel for Appellee Hoosier Racing Tire Corp.

John R. Gotaskie, Jr., Esq.
Fox Rothschild
625 Liberty Avenue, 29th Floor
Pittsburgh, PA 15222'

Theodore H. Jobes, Esq.  (Argued)
Christine Soares, Esq.
Fox Rothschild
2000 Market Street, 20th Floor
Philadelphia, PA 19103

Counsel for Appellee Dirt Motor Sports, Inc.,
  d/b/a World Racing Group


Helen M. Maher, Esq.

Boies, Schiller & Flexner
333 Main Street
80 Business Park Drive
Armonk, NY 10504

Counsel for Amicus-Curiae Grand-Am
  Road Racing and National Association
  for Stock Car Auto Racing, Inc.

Robert W. Powell, Esq.
Dickinson, Wright, Moon, Van Dusen
  & Freeman
500 Woodward Avenue, Suite 4000
Detroit, MI 48226

Counsel for Amicus-Curiae
United States Auto Club, Inc.

―――――――

OPINION

―――――――

COWEN, <u>Circuit Judge</u>

The Plaintiff in this antitrust matter, a tire supplier, appeals from the order of the United States District Court for the Western District of Pennsylvania granting the respective motions for summary judgment filed by the Defendants, a tire supplier competitor and a motorsports sanctioning body. Plaintiff's claims arise out of the adoption of the so-called "single tire rule" by various sanctioning bodies in the sport of dirt oval track

4

racing as well as the related exclusive supply contracts between these sanctioning bodies and the Defendant tire supplier. Plaintiff further challenges the District Court's denial of its motion for leave to amend its complaint. We will affirm.

I.

**A.The Parties**

We refer to the four companies listed as the Plaintiffs in the current matter by the name of the parent company, "STA."[1] STA manufactures and sells speciality tires for a variety of vehicles, such as aircraft, farming equipment, and racing cars. It specifically manufactures and sells a "house brand" known as "American Racer." This American Racer line includes dirt track racing tires, asphalt track racing tires, ATV ("all terrain vehicle") racing tires, passenger performance tires, and race track equipment tires. Defendant Hoosier Racing Tire Corp. ("Hoosier") is a family-owned business, which focuses almost exclusively on the racing tire business (in contrast to STA, which sells a large variety of different kinds of speciality tires and is owned by a holding company named Polymer Enterprises, Inc.). Hoosier is the largest race tire manufacturer in the world that specializes in manufacturing racing tires.

---

[1] The four Plaintiff companies are: (1) Race Tires America, Inc., a Division of Speciality Tires of America Inc.; (2) Speciality Tires of America, Inc.; (3) Speciality Tires of America (Pennsylvania), Inc.; and (4) Speciality Tires of America (Tennessee), LLC.

5

STA, Hoosier, and the Goodyear Tire and Rubber Co. ("Goodyear") represent the three major competitors in the alleged market of tires for dirt oval track racing in the United States and Canada. There were at least five competitors in this market in the 1980s and the 1990s, namely, STA, which was previously known as McCreary, Hoosier, Goodyear, Firestone, and M & H.

The evidence in the record indicates that Hoosier's market share in the dirt oval track market grew from 59.6% in 1998 to 65% in 2000. In terms of sales revenue, Hoosier's market share for dirt track racing tires increased from 69% in 2003 to 79% in 2007. For dirt sprint car tires, Hoosier's market share increased from 87% in 2003 to 94% in 2007. On the other hand, STA's share of the dirt tire market dropped from 29% to 19% between 2003 and 2007, while Goodyear's share remained the same at approximately 2%. STA's dirt sprint tire share likewise fell from 10% in 2003 to 5% in 2007, and Goodyear's share similarly went from 3% in 2003 to 1% in 2007.

Defendant Dirt Motor Sports, Inc. d/b/a World Racing Group ("DMS") is a motorsports sanctioning body. As explained in more detail in Section I.B, *infra*, DMS and the other sanctioning bodies organize and promote races and, in turn, promulgate rules governing these races. DMS, in particular, owns such well-known touring series as the "World of Outlaw Sprint Car Series" and the "Late Model Series." It sanctions over 5,000 races per year at over 200 dirt oval tracks in twenty-one states. In 2005, DMS acquired another sanctioning body known as United Midwest Promoters ("UMP"). There are two other

major sanctioning companies in the field of dirt oval track racing: (1) Amicus International Motor Contest Association ("IMCA") (sanctioning races at approximately 112 dirt oval tracks); and (2) WISSOTA Promotions, Inc. ("WISSOTA") (sanctioning races at approximately fifty-seven dirt oval tracks). Combined, DMS, IMCA, and WISSOTA sanction modified, late model, sprint, or stock car races at over 70% of the 636 weekly tracks in the United States.

### B. The Role of Sanctioning Bodies and the "Single Tire Rule"

As the District Court recognized, the role played by sanctioning bodies in dirt oval track racing (and, in fact, in motorsports racing in general) is of special importance here. Track owners or promoters typically belong to a sanctioning body, which charges sanctioning fees in exchange for this privilege of membership. These bodies sanction races, and they formulate rules for such races. These sanctioning bodies (like the track owners and promoters) compete to attract car owners (generally known as "racers"), drivers, and fans to their respective races. Accordingly, the sanctioning bodies create various incentives in order to get the most racers, drivers, and fans.

The record reveals that these sanctioning bodies often choose to adopt a "single tire rule." Such a rule generally requires that a specific tire type and brand be used on one or

7

more wheel positions for one or more classes of cars for a series of races or racing seasons.

Significantly, the sanctioning bodies generally do not buy the tires themselves, and the tires are purchased by the participating racers and drivers. The organizations instead establish the tire parameters and requirements for the race. Some rules may define the permissible tire by merely a bead size or some other physical dimension. Other rules may require that the tires at one or more wheel locations be a particular type or brand. Tire rules that do not require a specific brand of tire are generally called "open tire rules."

Tires are not the only components of a race car subject to a single source or manufacturer rule. Sanctioning bodies make rules that may specify the appropriate carburetors, mufflers, chassis, or other kinds of equipment to be used. For example, Amicus United States Auto Club, Inc. ("USAC") has a "spec engine rule" for its Ford Focus Midget Series, which requires the use of Ford engines. United Racing Club ("URC") has a rule requiring a single brand of cylinder heads, manufactured by the sanctioning body's sponsor. The International Race of Champions Series mandates that the drivers actually use identical cars. Regardless of the kind of equipment at issue, the record indicates that a sanctioning body makes these fundamental determinations based on an assessment of its own self-interest.

**C. Single Tire Rules and Exclusive Agreements**

Evidence in the record further demonstrates that STA has, at least in the past, supported the single tire rule. In fact, its own website takes credit for the concept itself, stating that:

> In the 1970's [sic], Joe Jacobs, the developer of the race tire business that eventually became Race Tires America, proposed and encouraged race tracks and promoters to adopt spec tire or track tire rules. Under this concept, track owners and promoters adopted a manufacturer's tire for a particular class of races for the duration of a racing season. The purpose of the rule was to avoid the almost constant pace of tire changes that were particularly costly to racers, and to encourage racer parity by removing the "'hot'" tire setups. With all racers competing on a single tire design and compound, the tire wars would be quelled and race results would be more related to a driver's skill and ability and not a more expensive "'state-of-the-art'" tire. The acceptance of spec tire rules contributed to the success and popularity of dirt track racing in America.

(A484.) STA's website goes on to attack the abuse of such "spec tire rules," claiming that such abuse has resulted, inter alia, in the concentration of market power in the hands of a single monopolistic tire supplier, the loss of true competition between the few remaining tire suppliers, and harm to STA, other suppliers, track owners, promoters, and the drivers themselves. In this litigation, STA attempts to distinguish its prior support for

9

the single tire rule by claiming that it merely promoted the adoption of a track rule that would remain in effect for a single racing season, in contrast to Hoosier's practice of entering into a series of exclusive supply contracts with major sanctioning bodies that, in turn, encompass thousands of races and last for periods of up to seven years.

In fact, the above statement from the website actually comes from a proposal by STA for a "Declaration in Favor of Competition." The accompanying petition or "Declaration" expressly calls for: (1) the establishment of track tire rules based on various objective criteria; (2) the prohibition of "any rule, policy, or practice mandating or providing for the use of a single manufacturer's tire;" (3) the creation of "non-discriminatory compensation rates" to offset "the cost of driver point funds and driver amenities;" (4) the related prohibition against tire suppliers making "lump sum or flat fee" payments to the sanctioning bodies, promoters, and tracks, and (5) changes on the part of the tire suppliers in order to ensure adequate inventories and company representatives at all racing events. (Id.) The petition also goes on to condemn the fact that the single tire formula previously used to achieve competitive parity has since evolved into "a scheme allowing a single manufacturer to capture and monopolize the market for dirt race tires." (Id.) It appears that approximately 1300 racers, drivers, and other racing industry participants have actually signed STA's "Declaration in Favor of Competition."

Irish Saunders, the contract services manager for Hoosier, internally circulated a sarcastic e-mail dated September 14, 2007,

10

in response to this "Declaration in Favor of Competition." This e-mail purportedly described Hoosier's "Declaration in Favor of Taking Over the Industry," as proposed by the tire supplier's general manager, "Smash."

The District Court also reviewed the process that sanctioning bodies may use to select a particular supplier under the applicable tire rule. In short, a sanctioning body may decide to send a formal Request for Proposal ("RFP") to the various tire suppliers. The organization usually requires the supplier to provide sponsorship contributions. In general, these contributions may be used as part of the sanctioning body's "point funds." These point funds are generally paid to winning drivers at the end of the racing season, and they represent one of the major incentives used by sanctioning bodies to attract racers and drivers. Nevertheless, the money received by the sanctioning body may actually be used in whatever manner the sanctioning body itself wants, such as to fund its general operations. A sanctioning body, in turn, is certainly free to request a less expensive tire instead of greater financial contributions. Furthermore, if a sanctioning body is satisfied with its current tire supplier, it may elect to remain with that supplier rather than solicit bids from the supplier's competitors.

According to STA, "[f]or the years 2003-2007, Hoosier knew of only seven instances (four of which were after RTA filed this suit) where sanctioning companies or tracks had requested competitive bids." (Appellants' Brief at 20 (citing A543-A544).) However, it still appears that the tire suppliers were generally aware when a contract exists and could seek to compete for the business if they wanted it. Tire suppliers have

11

accordingly been successful in their efforts to take business away from their competitors over the years.

The record in this case indicates that STA itself has competed, often successfully, to become the exclusive supplier of tires to several sanctioning bodies. In fact, STA, either directly or through its distributors, has successfully procured single tire contracts to the exclusion of Hoosier. Its distributors are required by contract to "interact[] with track owners/promoters and Associations and to actively pursue track rule and other race tire business." (A1439.) Even after the filing of this lawsuit, STA's distributors have continued to bid on exclusive tire supplier contracts, with some success. Furthermore, STA has repeatedly offered to pay money to the sanctioning bodies in exchange for an American Racer-only arrangement. For instance, Lias Tire, an STA distributor, recently won an exclusive agreement with URC, agreeing, inter alia, to pay $14,500.00 to this sanctioning body for the right to provide the exclusive tire at approximately thirty events in 2008. STA likewise has not instructed its distributors to cease making such exclusive deals or to refrain from offering or providing financial support to the sanctioning bodies.

Nevertheless, STA claims that Hoosier's exclusive single tire contracts foreclose competition. STA claims that these exclusive contracts date as far back as 1997, when Hoosier allegedly began to implement its "form contract" strategy.

Hoosier's form contract specifically obligates the sanctioning bodies and tracks "to insure that Hoosier Racing Tires are the only tires sold or run" in all events. (A1578-A1579 (emphasis omitted).) The form further provides that Hoosier

12

would pay promotional money to the sanctioning body or track. These promotional fees are unrestricted and accordingly may be used either for general operations or for point funds. In turn, the form contains a continuous renewal requirement, providing that the arrangement would be automatically renewed for another year unless written notice of intention to terminate was given by August 1. Such "nullification" of the agreement would allegedly release Hoosier from its obligation to provide at least some of the promised financial support. According to STA, "there is a strong incentive to renew, because non-renewal would jeopardize the prospect of a November payment" of the promised money. (Appellants' Brief at 12.) Hoosier's "Negotiating Guidelines" document also indicates that Hoosier seeks longer contracts based on the respective profit margins. Finally, Saunders sent out a January 24, 2007 e-mail, which was entitled "American Racer Pricing" and addressed at some length the issue of competition between STA and Hoosier.

Hoosier identifies over seventy exclusive contracts that it or its distributors have entered into with sanctioning bodies since 2003. Although referring in its appellate brief to other sanctioning bodies, STA generally focuses on five sanctioning bodies that have selected Hoosier as their exclusive supplier: (1) IMCA; (2) WISSOTA; (3) American Spring Car Series ("ASCS"); (4) USAC; and (5) DMS. In turn, the District Court itself considered at some length the practices of these five sanctioning bodies, and we will do so as well.

1.IMCA

13

IMCA sanctions races in the Midwest on both dirt and asphalt surfaces. It appears that, from the 1980s to approximately 2005, IMCA required its drivers to use the G-60 American Racer tire manufactured by STA. But this long-standing yet informal arrangement between STA and IMCA involved no set duration, no up-front money, no penalties, no automatic renewal, no enforcement mechanism, and was not even in writing. On the other hand, STA also evidently refused to disclose pricing information to IMCA or to explain a sharp increase in its tire prices.

In December 2003, IMCA sent an RFP to Goodyear, Hoosier, and STA for a three-year exclusive contract. Hoosier offered a five-year contract, informing the sanctioning body that this proposal was "very important to our overall business strategy." (A1418.) In addition, it evidently proposed substantial up-front money to IMCA, including a signing bonus, even though the sanctioning body did not request any such up-front payments. It further offered to pay IMCA money based on the number of tires ultimately sold. IMCA eventually entered into a five-year automatically renewable exclusive contract with Hoosier, which would, inter alia, purportedly limit price increases in the future. STA meanwhile has continued to sell its G-60 American Racer tire to non-IMCA tracks, including at least one track that chose to drop its IMCA sanction.

### 2. WISSOTA

WISSOTA has its principal place of business in Minnesota and sanctions races in Minnesota, North and South Dakota, Wisconsin, Wyoming, and Canada. It appears that WISSOTA has had a Hoosier-only rule since 1984. Hoosier

14

extended the contract to 2007 in exchange for Hoosier making a significant payment of money to be used to pay off a court judgment obtained by an excluded transmission manufacturer against the sanctioning body.

In October 2006, WISSOTA sent out an RFP to Goodyear, Hoosier, and STA. The sanctioning body's president, Terry Voeltz, advised STA that its racers and drivers wanted a low tire price without point funds. STA offered (through a distributor) a lower tire price than Hoosier (at least at the beginning of the contract term). It also offered less financial support to the sanctioning body than Hoosier. On the other hand, Hoosier proposed a higher (initial) tire price, a higher annual payment to the sanctioning body, as well as additional payments to the individual WISSOTA track promoters themselves as part of a bonus program. In fact, these promoters (and WISSOTA board members) were already receiving bonus payments from Hoosier.

WISSOTA's board of directors then met in July 2007 to review the bids and select an exclusive tire supplier. WISSOTA's board decided to accept the Hoosier proposal. Voeltz testified at his deposition that STA essentially offered the same price as Hoosier after taking into account STA's higher price escalation over the course of the contract. The president indicated that he had expected to select American Racer tires but was surprised by STA's actual bid. In turn, STA informed WISSOTA in its own bid that "[t]he process that has led to this proposal has been open, honest and fair." (A1524.) STA's general manager, David Mateer, subsequently discussed the process with Voeltz, who indicated that STA could have gotten the contract if it had matched Hoosier's financial contribution.

15

However, such a matching proposal would have evidently reduced or eliminated STA's own profit margin.

### 3.ASCS

ASCS, headquartered in Oklahoma, runs sprint car races in several regional series as well as a national series. Since 1999, Hoosier has had automatically renewing and exclusive contracts with this sanctioning body. In 2007, STA recognized an opportunity to become the exclusive right-rear tire supplier for ASCS's "360 sprint car series." ASCS did not circulate a formal RFP, but STA still met with the sanctioning body and submitted a bid. Its bid attempted to match Hoosier's proposal and included a financial contribution in exchange for exclusivity. Nevertheless, ASCS ultimately chose to retain its Hoosier-only rule for the right-rear wheel position.

### 4.USAC

USAC, headquartered in Indiana, sanctions sprint car races on both dirt and asphalt races, primarily in the Midwest and West. It appears that Hoosier has had long-term contracts with this sanctioning body since before 1998, despite some tension between the sanctioning body leadership and certain members regarding these arrangements. In 1998, the USAC president actually informed these members that the sanctioning body would remain under contract with Hoosier for only two more years, which evidently was an inaccurate assertion.

In 2003, USAC decided to implement a right-rear single tire rule for certain classes, and it accordingly sent out an RFP for a three-year contract. Goodyear, Hoosier, and STA submitted competing bids. STA proposed that, for two classes of cars

16

(USAC midgets and sprint cars), the tire business would be split between various suppliers. STA likewise did not propose exclusivity for the "Silver Crown" series. Hoosier ultimately won the contract. Without sending out an RFP, USAC evidently renewed its exclusive contract with Hoosier for another three years in 2006. A USAC executive, Rolland Helmling, testified at his deposition that he was not aware of any particular reason for the length of the sanctioning body's contracts with Hoosier.

### 5. DMS

In 1994, STA, through its distributor, Lias Tire, won the bid to be the exclusive tire supplier for DMS's "Big-Block" and "358" modified races. Hoosier, however, successfully outbid STA in 1995. Since then, Lias Tire has not bid on another DMS contract.

Hoosier and DMS have evidently entered a series of exclusive contracts over an extended period of time. Hoosier's exclusive dealings with UMP actually predate the sanctioning body's 2005 acquisition by DMS. Furthermore, DMS's president, Thomas Deery, went so far as to characterize tires sales as the "fuel" of UMP. (A1716.) Accordingly, the relevant contracts have required Hoosier to make financial contributions to the sanctioning body based on the number of tires ultimately sold to the racers and drivers participating in the races sponsored by UMP.

The District Court specifically pointed to the following four tire contracts between Hoosier and DMS: (1) a 2007-2008 exclusive contract for "UMP Modifieds" and other classes; (2) a 2007-2008 exclusive contract for "DIRT Northeast Big Block Modified"; (3) a 2007-2009 exclusive contract for the "World of

Outlaw National Sprint Series"; and (4) a 2008-2010 exclusive contract for "UMP Late Models."

It appears that, at least prior to the commencement of this litigation, DMS did not select its tire suppliers through a formal bidding process. In fact, it evidently did not possess any specific procedures or protocols for selecting a tire supplier. The sanctioning body accordingly did not send any RFPs to STA prior to October 2007, and it otherwise rejected STA's various inquires, stating at one point that Hoosier had more than doubled its financial support to DMS.

In October 2007, after the filing of this lawsuit, DMS sent out an RFP to seven different tire manufacturers. It specifically requested proposals for a one-year contract to be the exclusive tire supplier for "UMP DIRTcar Late Model Series." Only Goodyear, Hoosier, and STA responded. The Hoosier and Goodyear bids both contemplated an exclusive arrangement, but STA's own proposal contemplated "non-exclusivity." On the other hand, STA proposed a lower tire price than Hoosier. DMS ultimately deemed the STA bid to be non-responsive and awarded a three-year exclusive contract to Hoosier.

In a very similar process, DMS sent an RFP in October 2008 to seven tire manufacturers seeking proposals for a contract to be the exclusive tire supplier for the "UMP DIRTcar Modified (NE)" races. Yet again, the same three companies responded with bids, and, once again, DMS deemed STA's proposal as non-responsive because, unlike its competitors, it contemplated a non-exclusive relationship. DMS therefore ended up awarding Hoosier another exclusive contract for three years.

18

**D. The Sprint Car Summit and Hoosier's National Sprint Spec Tire**

In July 2006, DMS, competing sanctioning bodies, promoters, and track operators held a "Sprint Car Summit" to address the decline in car counts and fans at "410 sprint car" races. Such "sprint" races are more likely to occur as part of a "touring" series of races. Touring series, in turn, typically showcase well-known drivers and promote rivalry between these prominent drivers and their local challengers. While STA was not invited, Hoosier was initially asked to attend. However, its invitation was eventually withdrawn. At the Summit, the attendees discussed several options for regenerating interest in sprint car racing, including possible tire improvements. After the Summit, the president of DMS, Deery, and its executive vice president, Benjamin Geisler, approached Hoosier, requesting that the tire manufacturer supply a less aggressive sprint tire that would promote movement and passing. They further discussed the possibility of entering into a contract to make Hoosier the exclusive tire supplier for sprint car races. On December 15, 2006, Hoosier accordingly entered into an exclusive three-year deal to provide right-rear tires for DMS's "World of Outlaws" sprint touring series. On the same day, Hoosier issued a press release announcing that it had developed a "national sprint spec tire," which would be available in three different compounds.

As part of this December 15, 2006 contract, Hoosier promised to pay DMS to solicit competing sanctioning bodies and others to enter similar exclusive contracts with the tire supplier. Geisler contacted various sprint car tracks, asking them to adopt the "national sprint tire rule," and updated Hoosier itself as to which tracks and series were signing onto the rule. He

19

specifically informed Hoosier that these "track/series deals" had to be completed quickly in order to "fend off any plans from American Racer." (A1603.) In particular, STA's per-tire price for its sprint product was approximately $20 less than the per-tire price offered by Hoosier for its new "national sprint tire."

Like DMS, other sanctioning bodies have entered into automatically renewable contracts with Hoosier, which require them to promulgate and enforce a Hoosier-only tire rule. For instance, USAC announced an open tire rule for certain sprint events in January 2007. When Tony Rose, an STA representative, heard about a meeting between USAC and Hoosier, he asked USAC if he could attend, but was turned down. However, USAC ultimately adopted a Hoosier-only rule for the sprint events. In addition, a subsequent call by STA's general manager, Mateer, to USAC was not returned. Accordingly, STA's sprint tire sales have drastically fallen, even though a sprint racer won in 2006 using its American Racer tire.

It appears that the sprint tire contract between Hoosier and DMS expired after the current appeal was filed. According to both Hoosier and DMS, DMS chose not to renew the contract with Hoosier and instead entered into an exclusive contract with Hoosier's competitor, Goodyear.

STA additionally claims that Hoosier and WISSOTA used their collective market power to defeat a new sanctioning body called DTRA ("Dirt Track Racing Association"), which attempted to sanction tracks in WISSOTA's territory. Specifically, DTRA racers and drivers would have used less expensive Goodyear tires. But Paul Menting from Hoosier wrote to WISSOTA, stating, inter alia, that "this is a sanctioning body

20

war that involves Hoosier because we are partners with Wissota" and that Hoosier "would desire to attack common threats as partners." (A1599.) Hoosier declined to submit a proposal in response to DTRA's RFP, stating that, "[i]n order to continue properly servicing and supplying our existing contract business, we cannot at this time commit ourselves to fulfilling a Spec Tire contract." (A1600.) Hoosier, acting through a distributor, also purportedly refused to sell to another touring series known as Carolina Clash because the series allowed its racers and drivers to use what the series believed was the more popular, cheaper, and superior American Racer product.

### E. The Alleged Costs and Benefits of the Single Tire Rule and Hoosier's Exclusive Contracts

The parties and the amici devote a great deal of attention to the alleged benefits and costs of, inter alia, the single tire rule and Hoosier's specific contractual arrangements with the various sanctioning bodies.

Mateer claimed that Hoosier's foreclosure rate in dirt late model racing is approximately 50%. According to STA, "Hoosier-only rules dictate tires in 76% of [the] late model touring series in the Midwest, 57% of the modified touring series, 60% of the late model 'crate' series, and 25 of 28 sprint car series." (Appellants' Brief at 18 (citing A1714-A1715, A1710-A1713).)

STA further claims that the alleged practices have caused harm to the real consumers, namely the race car owners and drivers who actually purchase the tires themselves, in the form of, among other things, higher prices and less choice. The evidence in the record does indicate that Hoosier generally

21

charges more per tire than STA. Providing yet another example, STA points out that the sanctioning body for the "Crate Racin USA" series adopted a Hoosier-only rule, even though Hoosier offered a per-tire price $50.00 higher than STA. In the time period after the formal announcement of the rule change but before its implementation, 40-45% of the drivers in this series continued to use American Racer tires. More broadly, many drivers have evidently chosen STA's American Racer tires when given the choice to do so, based on such grounds as better durability and therefore lower tire costs over the long term. For instance, Victor Lee, the 2008 winning driver of the "Battle of the Bluegrass" racing series, actually switched from Hoosier to American Racer, and claimed he cut his tire bill in half because of the purported superior durability of the American Racer product. Similarly, race team owners complained to USAC that: "When USAC made Hoosier the spec tire, costs tripled." (A1481.)

On the other hand, STA's own expert, Dr. David Reitman, acknowledged the following:

> The sanctioning organization or promoter ultimately decides whether or not to enter into a contract with Hoosier requiring a Hoosier-only rule; however they make this decision in their own best interest, not necessarily in the interests of tire customers, taking into account the compensation offered by or negotiated with Hoosier. . . .

(A1921.)

Unsurprisingly, the amici, Hoosier, and (especially) DMS turn to the rather extensive evidentiary record in this case in an

22

attempt to establish that the single tire rule and the related exclusive contracts result in significant pro-competitive or sports-related benefits. Simply put, the following justifications or benefits have been offered for the rule itself and the related contracts: (1) supplier concerns; (2) safety; (3) parity; (4) controlling prices and costs; and (5) increasing car counts and the number of fans. In turn, the record contains, inter alia, the deposition testimony or statements of the following individuals concerning these purported benefits: (1) Doug Bland, the owner of Springfield (Missouri) Raceway; (2) Kevin Coffey, the owner of Mountain Raceway; (3) Deery, president and chief operating officer of DMS; (4) Leonard ("Sam") Driggers, racing director of DMS; (5) Justin Fantozzi, Goodyear's marketing manager; (6) Helmling, a member of the board of directors of USAC; (7) Jacobs, the McCreary executive credited with developing the single tire rule; (8) Mateer, the general manager of STA; (9) Steve O'Donnell, vice president of racing operations for NASCAR; (10) Mooney Starr, the general manager of Batesville (Arkansas) Motor Speedway; and (11) Voeltz, WISSOTA's president. While acknowledging the extensive nature of the evidence presented, we focus on the statements made by the Plaintiff STA's own personnel as well as by DMS's employees, as the only sanctioning body actually named as a Defendant in this lawsuit.

STA's general manager agreed that limiting the number of tires bought by racers and drivers could be good for racing and that a single tire rule could reduce costs. Mateer explained that:

> If you showed up at the racetrack for the event with four tires that you had just purchased at your tire dealer shop, and there's another tire supplier at the track showing off their brand spanking new product, and its considerably faster than the tires you just bought, those four tires you just bought are no longer competitive on that racetrack.

23

(A842.) Acknowledging, like STA's own website, his company's role in pioneering the single tire rule, Mateer stated that STA promoted the rule in order "[t]o eliminate the constant in-season product development that was requiring the racers to buy every trick new tire that came along." (A833.)

In addition, Jacobs actually testified at some length about the various advantages of the single tire rule in a 1982 deposition conducted as part of an antitrust lawsuit filed in the United States District Court for the District of Massachusetts by M & H against both Hoosier and several tracks and driving clubs who had adopted the rule and entered into an exclusive arrangement with Hoosier. M & H's challenge to the rule itself was ultimately rejected by the First Circuit. See M & H Tire Co. v. Hoosier Racing Tire Corp., 733 F.2d 973 (1st Cir. 1984). According to Jacobs, McCreary supported the single tire rule because it was a "viable marketing procedure and method" and "a healthy way to sell race tires." (A411.) He further emphasized that the rule reduced tire costs because it countered the incentive for racers and drivers to get the newest and best tires for each and every race.

Driggers from DMS similarly testified that the car counts increased where a single tire rule is in effect:

> When you run an open tire rule in my race track area, which is primarily the midwest for the most part, you can run a World of Outlaw show or any of the high dollar sanction – or series races around the country and your car count with open tire rule will be half of what it will be on my tire rule. Because of my tire rule, local guys can go run this race, pay the $100 entry fee, the pit pass or whatever else they have to pay and run this race and possibly go home with some money. If they have to go buy a four to six different tires to run this race to be competitive with an open tire rule

24

and the best they are going to run is 18th or 19th and they are going to get 700 bucks, it cost them 1,200 bucks to make the 700 bucks so therefore, they go elsewhere. They go to a UMP sanctioned race where they don't have to buy anything.

(A159-60.)

According to Deery, "[r]ace car specifications have been the cornerstone of motorsports' development and have allowed the sport to mature into a fully organized and recognizable event." (A1931.) The president of DMS further noted that "[m]ost of the nationally recognized divisions of racing have a common set of rules and are usually governed by a single sanctioning body." (Id.) Such rules specifically promote continuity and consistency, thereby benefitting both the racing competitors and the fans. Defending single tire rules, Deery claimed that, among other things, "spec tires save money, provide a level field, are safe and make for a more successful show." (A1934.)

For its part, STA vigorously claims that, at the very least, there are factual disputes with respect to the various benefits offered by its adversaries to justify the single tire rule and the related exclusive Hoosier contracts.

With respect to "supplier concerns," Hoosier itself evidently has only one tire plant. Hoosier's own contracts also contain a "Force Majeure" clause, excusing it from performance where, for instance, there is a work stoppage or an act of God. The record demonstrates that these kinds of problems are not unprecedented. Specifically, the owner of the Fastrak dirt racing series allowed multiple tire suppliers to sell tires for its races after Goodyear was unable to fulfill its exclusive tire commitments due to labor issues.

DMS admitted that there has never been any specific concerns about tire safety in its open tire rule races. Similarly,

25

Helmling from USAC was unaware of any safety issues when tire brands competed for business.

Turning to the concept of "parity," it appears that the Hoosier-only rule itself may permit the use of *different* kinds of Hoosier tires in the same race. For instance, UMP's rules evidently have allowed four different Hoosier tires to be used. In turn, some racers and drivers have requested, not less, but more tire choices, in order to have more options in the future. Helmling acknowledged at his deposition that the participants in USAC's open sprint races were in parity. Other witnesses testified that the whole concept of parity means having a different driver win every night. Nevertheless, there is evidence in the record indicating less variety of winners in Hoosier-only races.

According to STA, there is no evidence in the record showing that the failure to enter an exclusive contract with Hoosier would result in higher costs. It likewise claims that there is no evidence whatsoever establishing that the Hoosier contracts have any effect on car counts or fan attendance. In fact, they point to evidence purportedly showing the opposite.

STA further asserts that, even if the rule otherwise possessed the claimed benefits, the single tire rule as practiced here does not represent the least restrictive means to serve these purported goals. It offers the following alternative: the adoption of a "limited compound competition" rule, which would allow racers to select from a specified list of tires from the various manufacturers. Alternatively, STA proposes that the sanctioning bodies could choose to limit the number of tires used over the course of a season. According to STA, the single tire rule also gives racers and drivers an incentive to cheat by treating their tires with chemicals, thereby requiring tire inspections before each race.

### F. Procedural History

STA filed its initial complaint in the District Court on September 25, 2007. Naming Hoosier as the sole Defendant, it alleged: (1) monopolization in violation of Section 2 of the Sherman Act; (2) conspiracy to restrain trade in violation of Section 1 of the Sherman Act; (3) attempted monopolization in violation of Section 2 of the Sherman Act; (4) conspiracy to monopolize; and (5) a declaratory judgment claim. Less than a month later, STA filed an amended complaint adding DMS as the second Defendant.

On January 10, 2008, the District Court entered a scheduling order, which, among other things, established a deadline of May 30, 2008, for the amendment of pleadings. STA subsequently filed a second amended complaint to add two additional co-plaintiffs. On May 30, 2008, STA moved to amend the complaint a third time in order to add a new count alleging illegal tying under Section 1 of the Sherman Act. The Court granted this unopposed request, and the third amended complaint was filed on June 23, 2008.

On November 19, 2008, STA once again sought leave to amend the complaint, this time wishing to add a count alleging a concerted refusal to deal or, in other words, a group boycott. This contested motion was denied by the District Court on December 16, 2008. According to the District Court, STA failed to demonstrate the requisite good cause, and the addition of yet another claim based on a new legal theory would also be prejudicial to the other parties.

Hoosier and DMS filed motions for summary judgment, and STA likewise moved for partial summary judgment as to the defenses of unclean hands and in pari delicto. On September 15, 2009, the District Court granted the motions for summary judgment filed by Hoosier and DMS (and denied STA's motion as moot). It provided an extensive explanation for its ruling in an accompanying memorandum opinion. Simply put, the District Court found that: (1) "where, as here, a sanctioning body freely

27

decides to adopt a single tire rule, and then freely selects a supplier, no antitrust violation is present as a matter of law – either under Section 1 or 2 of the Sherman Act"; and (2) "STA has not suffered an 'Antitrust Injury' and thus, does not have standing to bring this action." (A41 (emphasis omitted).)

STA filed a timely notice of appeal. USAC, National Association for Stock Car Auto Racing, Inc. ("NASCAR"), IMCA, and Grand-Am Road Racing have filed an amicus curiae brief.

## II.

The District Court possessed jurisdiction over this antitrust matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 15. We have appellate jurisdiction under 28 U.S.C. § 1291. We further exercise plenary review over a District Court's grant of summary judgment. See, e.g., Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374, 380 (3d Cir. 2005).

As the District Court recognized, the resolution of a summary judgment motion is often an especially difficult task in the antitrust context, particularly in light of the inherent factual complexities typically involved as well as the paramount importance of motive and intent in the legal analysis. This case certainly is no exception.

Nevertheless, the District Court also properly acknowledged that summary judgment is not disfavored in the antitrust context. The entry of summary judgment in favor of an antitrust defendant may actually be required in order to prevent lengthy and drawn-out litigation, which may have a chilling effect on competitive market forces. See, e.g., Capital Imaging Assoc., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 541 (2d Cir. 1993). Furthermore, "'antitrust law limits the range of permissible inferences' that can be drawn 'from ambiguous evidence.'" Harrison Aire, 423 F.3d at 380 (quoting

28

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986)). To avoid summary judgment, an antitrust plaintiff must come forward with economically plausible evidence supporting the elements of its claim. See, e.g., Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 468-69 (1992); Matsushita, 475 U.S. at 587; Harrison Aire, 423 F.3d at 380. When the evidence in the record is as consistent with permissible competition as it is with an illegal conspiracy, such evidence, standing alone, fails to support an inference of an illegal conspiracy. See, e.g., Matsushita, 475 U.S. at 588. In the end, the plaintiff in an antitrust case responding to a summary judgment motion must overcome a "higher threshold," which is imposed in order "to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition." In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

The parties further agree that this Court reviews the denial of a motion to amend under an abuse of discretion standard of review. See, e.g., E. Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 339-41 (3d Cir. 2000).

III.

As highlighted by the extensive factual discussion in Section I, *supra*, this appeal presents the Court with an unusual and challenging set of circumstances. Simply put, this case involves a relatively large number of entities, specifically the various sanctioning bodies governing the sport of dirt oval track racing in the United States and Canada, which, over an extensive period of time dating back decades, have adopted the single tire rule for various races and, in turn, have entered exclusive contracts with the major tire suppliers. Furthermore, even though the parties and the amici cite to a large number of prior cases from this Court, our sister circuits, and other courts, very few of these decisions appear to be directly on point. In turn, the decisions that are, more or less, on point are often distinguishable on a variety of grounds (or otherwise are not binding on this

29

Court). Finally, the importance of this case goes far beyond the tire suppliers and sanctioning body actually named as the Plaintiffs and Defendants. In fact, our result and reasoning could have an effect beyond the world of dirt oval track racing (or even motorsports racing in general).

Having fully considered the numerous arguments of the parties and the amici, the record on appeal, the District Court's thorough and carefully reasoned ruling, and the governing legal principles, we ultimately determine that the District Court properly ruled in favor of Hoosier and DMS. We reach this result based on the following considerations: (1) Hoosier clearly has not coerced, or otherwise improperly interfered with, the determinations of DMS and the other sanctioning bodies to adopt the single tire rule and to enter into the respective exclusive supply contracts; (2) the sanctioning bodies presented, in good faith, more than sufficient pro-competitive or business justifications for their actions; and (3) STA has otherwise not suffered any cognizable antitrust injury because it has had the opportunity to bid on exclusive supply deals and has in fact done so with some success.

### A. Basic Principles of Antitrust Law

This Court has never directly considered the legality of a practice like the single tire rule or the specific kind of exclusive contracts entered by the sanctioning bodies and Hoosier. Nevertheless, there are certain fundamental and well-established legal principles that must guide our analysis. The District Court itself accurately summarized at least some of these principles in its summary judgment ruling.

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. It is well established that this provision prohibits only "unreasonable" restraints of trade. See, e.g.,

30

NCAA v. Bd. of Regents, 468 U.S. 85, 98 (1984). STA appears to agree that the "rule of reason" standard applies in this context. See, e.g., Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1368 (3d Cir. 1996).

"In order to survive summary judgment in cases where [the rule of reason] applies, the plaintiff must show concerted action, antitrust injury, evidence that the conspiracy produced 'adverse, anti-competitive effects within the relevant product and geographic markets,' and evidence 'that the objects of and the conduct pursuant to the conspiracy were illegal.'" InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159 (3d Cir. 2003) (quoting Rossi v. Standard Roofing, Inc., 156 F.3d 452, 465 (3d Cir. 1998)). The plaintiff may satisfy its burden by showing either actual anti-competitive effects or proof of the defendant's market power. See, e.g., Orson, 79 F.3d at 1367. The notion of "market power" in this context is defined as the ability to raise prices above those that would exist in a competitive market. See, e.g., id.

The burden then shifts to the defendant to show a sufficient pro-competitive justification or objective for the challenged conduct. See, e.g., id. at 1367-68. A restraint cannot be justified solely on the basis of social welfare considerations. See, e.g., United States v. Brown Univ., 5 F.3d 658, 678-79 (3d Cir. 1993). The plaintiff then must demonstrate that the restraint itself is not reasonably necessary to achieve the stated objective. See, e.g., Orson, 79 F.3d at 1368. In other words, "[e]ven if an anticompetitive restraint is intended to achieve a legitimate objective, the restraint only survives a rule of reason analysis if it is reasonably necessary to achieve the legitimate objectives proffered by the defendant." Brown Univ., 5 F.3d at 678-79 (citations omitted). "'The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or

31

even destroy competition.'" Orson, 79 F.3d at 1367 (quoting Bd. of Trade v. United States, 246 U.S. 231, 238 (1918)).

Section 2 of the Sherman Act targets persons "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of . . . trade or commerce." 15 U.S.C. § 2. This offense of monopolization has two elements: "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" Eastman Kodak, 504 U.S. at 481(quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). As to the second element, "[a] monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits." LePage's Inc. v. 3M, 324 F.3d 141, 147 (3d Cir. 2003) (en banc) (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 n.32 (1985)). In turn, the offense of attempted monopolization has the following three elements: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993) (citation omitted). The final element requires an inquiry into the relevant product and geographic market as well as the defendant's economic power in that market. See, e.g., id. at 459. In turn, market share, while crucial, may not always be determinative. See, e.g., United States v. Microsoft Corp., 253 F.3d 34, 54 (D.C. Cir. 2001) (en banc) (per curiam). Once the plaintiff demonstrates harm to competition, the defendant then has to show that it is actually promoting a pro-competitive or legitimate business objective. See, e.g., United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187, 196-97 (3d Cir. 2005). Ultimately, Section 2 is directed against conduct that "unfairly tends to destroy competition itself," as

opposed to even "severe" competition.  Spectrum Sports, 506 U.S. at 458 (citations omitted).

STA also claims that it has been the victim of unlawful "tying."  "'Tying is defined as selling one good (the tying product) on the condition that the buyer also purchase another separate good (the tied product).'"  Harrison Aire, 423 F.3d at 385 (quoting Town Sound & Custom Tops, Inc. v. Chyrsler Motors Corp., 959 F.2d 468, 475 (3d Cir. 1992) (en banc)).

A private antitrust plaintiff must further establish that it suffered an "antitrust injury" as a result of the misconduct and therefore possesses the standing necessary to seek relief.  The antitrust laws were enacted "'for the protection of competition not competitors.'"  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962)).  Therefore, the injury prong requires:  "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful."  Gulfstream III Assocs. Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 429 (3d Cir. 1993) (citing Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 978 F.2d 1318, 1327-28 (3d Cir. 1992)).

The District Court correctly recognized that exclusive supply contracts or exclusive dealing agreements have been frequently upheld when challenged on antitrust grounds.  See, e.g., E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc., 357 F.3d 1, 8 (1st Cir. 2004) (stating that exclusive dealing contracts are not disfavored by antitrust laws and ordinarily pose threat to competition only in very discrete circumstances); Barr Labs, Inc. v. Abbott Labs, 978 F.2d 98, 111 (3d Cir. 1992) (recognizing that "existence of legitimate business justifications for the [exclusive dealing] contracts also supports the legality of the global contracts").  "Rather, it is widely recognized that in many circumstances [exclusive dealing arrangements] may be highly efficient – to assure supply, price

33

stability, outlets, investment, best efforts or the like – and pose no competitive threat at all." E. Food Servs., 357 F.3d at 8 (citation omitted). Expressly rejecting any assertion that exclusive deals are subject to a per se rule of illegality, the Seventh Circuit in Menasha Corp. v. News America Marketing In-Store, Inc., 354 F.3d 661 (7th Cir. 2004), appropriately explained that the competition to be an exclusive supplier may constitute "a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress." Id. at 663 (citing Paddock Publ'ng, Inc. v. Chicago Tribune Co., 103 F.3d 42 (7th Cir. 1996)).

On the other hand, we agree with STA that such exclusive agreements are not exempt from antitrust scrutiny. In fact, the Third Circuit addressed exclusive dealing arrangements in its en banc ruling in LePage's Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003) (en banc), and, more recently, in United States v. Dentsply International, Inc., 399 F.3d 181 (3d Cir. 2005). In the en banc case, the Court upheld a jury verdict under Section 2 against 3M, a clearly dominant supplier in the transparent tape market that paid major retailers through a rebate program "designed to achieve sole-source supplier status" (and also entered exclusive dealing agreements with at least two retailers), LePage's, 324 F.3d at 157, and thereby cut off its plaintiff competitor from "key retail pipelines," id. at 160. In Dentsply, this Court reversed the trial court's judgment in favor of the defendant, ruling that an exclusivity policy imposed by an artificial teeth monopoly on its dealers violated Section 2. Dentsply, 399 F.3d at 184; see also, e.g., E. Food Servs., 357 F.3d at 8 (providing as "best example" of possible threat to competition situation in which market itself is already heavily concentrated and long-term exclusive contracts then "foreclose so large a percentage of the available supply or outlets that entry into the concentrated market is unreasonably constricted").

**B.Application of Legal Principles**

34

We now come to the challenging task of applying these fundamental legal principles to the specific circumstances presented by this appeal. Like the District Court, we accept, for purposes of this Opinion, STA's definition of the relevant market, in short: the market for the sale of racing tires that race on dirt oval tracks in the United States and Canada. Further following the example set by the District Court (as well as the parties and the amici), our analysis focuses on the following components: (1) the fundamental if contested notion of "coercion"; (2) the various benefits and justifications offered in support of the single tire rule and the related exclusive contracts between Hoosier and the various sanctioning bodies; and (3) the antitrust standing requirement. At the outset, we acknowledge that these components overlap in practice, although they do represent rather distinct aspects of the antitrust inquiry. For the sake of clarity and to avoid unnecessary repetition, we accordingly: (1) in the coercion discussion, focus on the issue of whether the sanctioning bodies have been free to adopt the single tire rule and to enter into an exclusive supply agreement with the supplier of their choice and also address the specific terms contained in Hoosier's contracts; (2) in the justification discussion, obviously turn to the various justifications and benefits offered in support of the single tire rule itself as well as the appropriate degree of deference to be accorded the determinations of sanctioning bodies and similar sports-related organizations; and (3) in the antitrust injury analysis, consider whether STA has had a real opportunity to compete with Hoosier for single tire business in this market.

### 1. "Coercion"

The notion of "coercion" occupied an especially important role in the District Court's reasoning. Hoosier, DMS, and the amici likewise emphasize this concept on appeal. For its part, STA vigorously contests the role of the concept itself, and, in the alternative, it contends that there are genuine issues of

material fact as to whether Hoosier has actually "coerced," or otherwise colluded with, the various sanctioning bodies.

We do acknowledge that the District Court did not cite to any specific case or any other authority in support of its assertion that coercion constitutes an essential element of a successful antitrust claim in the present circumstances. STA, among other things, quotes a leading antitrust commentator, who stated that "'it matters little whether one views exclusive dealing as "imposed" by the dominant firm or "agreed upon" by the dominant firm and its dealers.'" (Appellants' Brief at 35 (emphasis in quotation omitted) (quoting H. Hovenkamp, Antitrust Law ¶ 1800c5, at 20 (Aspen 2005)).)

We note, however, that this concept has played a key, if sometimes unexplored, role in the relevant case law, especially in the Section 2 context. For instance, the Court in Dentsply expressly noted that, among other things, the exclusivity policy at issue was "imposed by a manufacturer on its dealers," Dentsply, 339 F.3d at 184, and that, "[w]hile the [customers] might prefer to sell the [products] of multiple manufacturers, if faced with an 'all or nothing' choice they may accede to the dominant firm's wish for exclusive dealing," id. at 195 (quoting Areeda & Hovencamp, Antitrust Law ¶ 1802e3, at 78-79 (2d ed. 2002)). Likewise, the en banc Court in LePage's confronted a situation in which the seller, which had clear monopoly power over the market, induced retailers to purchase a full line of products from it, including products its competition did not make, with the intent of forcing any such competition from the market and then raising prices. LePage's, 324 F.3d at 157-63.

In Santana Products Inc. v. Bobrick Washroom Equipment, Inc., 401 F.3d 123 (3d Cir. 2005), the plaintiff toilet partition manufacturer brought claims under Sections 1 and 2 of the Sherman Act after the government selected its competitor's products based on the specifications chosen by the government's architects, alleging, inter alia, that the competitor and its

representatives falsely claimed that the plaintiff's own products were a fire hazard. Id. at 125-28. This Court ultimately affirmed the summary judgment granted in favor of the competitor, rejecting the group boycott claim and instead concluding that there was no restraint where the decision to choose a product was in the hands of the decision-maker (i.e., the architects) for the consumer (i.e., the government). Id. at 133 ("Unlike cases where the alleged exclusionary conduct leaves the consumer with no input whatever, the decision to specify 'was always ultimately in the hands of the consumer.'" (quoting Stearns Airport Equip. Co., Inc. v. FMC Corp., 170 F.3d 518, 525 (5th Cir. 1999))). Because the plaintiff failed to allege that the defendants "engaged in coercive measures that prevented [the plaintiff] from selling its products to any willing buyer or prevented others from dealing with [the plaintiff]," id. at 132, it was never really "excluded from competition," id. at 133. "'Without a showing of some other factor, we can assume that a customer will make his decision only on the merits,'" and the appropriate response in such circumstances "'would seem to be an increase in the losing party's sales efforts on future potential bids, not an antitrust suit.'"  Id. (quoting Stearns, 170 F.3d at 525).

In the end, although we do not hold that coercion is an essential element of every successful antitrust claim, we conclude that coercion is a fundamental consideration in the *present* circumstances, namely, where various sports sanctioning bodies have freely adopted their own equipment rules and then freely entered into exclusive contracts with the respective suppliers. However, we add that Hoosier and DMS are *not* entitled to summary judgment merely because there is an absence of coercion or interference on the part of Hoosier. On the contrary, the sanctioning bodies must still offer good faith justifications for the alleged conduct. As discussed in Section III.B.2, *infra*, DMS and the other sanctioning bodies do present more than adequate justifications for their actions.

37

STA, in turn, raises a variety of contentions in support of its theory that there are genuine issues of material fact with respect to the existence of either coercion on the part of Hoosier or, at the very least, collusion between Hoosier and the various sanctioning bodies, especially DMS. The District Court did acknowledge that Hoosier's standard form contract provides for payments to the sanctioning body, lasts for a lengthy period of time, contains an automatic renewal provision, and allegedly provides that, if the sanctioning body exercised its right not to renew, the remaining financial contribution to the sanctioning body would be forfeited. We likewise are particularly troubled by the so-called Sprint Summit and the resulting relationship between Hoosier and DMS. This Court nevertheless finds that the various contentions raised by STA fail to demonstrate the existence of a genuine issue of material fact as to whether its competitor has coerced or otherwise unduly interfered with the decision-making process of the various sanctioning bodies.

Initially, we must not overlook the crucial and undisputed fact that, in the words of STA's own expert, "[t]he sanctioning organization or promoter ultimately decides whether or not to enter into a contract with Hoosier requiring a Hoosier-only rule . . . in their own best interest." (A1921.) In fact, it appears clear that the major sanctioning bodies themselves generally prefer the single tire and, at least sometimes, desire a Hoosier-only rule. The present circumstances actually resemble the situation described by the Seventh Circuit in Menasha:

> That retailers and manufacturers *like* exclusive deals implies that they serve the interests of these, the consumers of couponing services [provided by the plaintiff and its competitor defendant]. When the consumers favor a product or practice, and only rivals squawk, the most natural inference is that the complained-of practice promotes rather than

38

> undermines competition, for what helps consumers often harms other producers such as [the plaintiff].

Menasha, 354 F.3d at 663.

Furthermore, it appears that it is a common and generally accepted practice for a supplier to provide a sports sanctioning body or similar sports-related organization financial support in exchange for a supply contract (although such practices, no matter how widely followed, cannot be characterized as totally innocuous). In fact, STA has actually engaged in such behavior and has specifically included offers of financial support in its various successful and unsuccessful proposals to the respective sanctioning bodies over the years. In turn, these financial contributions may be used as part of the sanctioning body's point funds, and such point funds constitute a crucial incentive offered by the sanctioning body to attract prospective racers and drivers to its own races. As to the amount and specific terms of the contributions, it is no more an act of coercion, collusion, or improper interference for Hoosier, STA, or any one else to offer more money to the sanctioning body than it is for such suppliers to offer the lowest tire prices. In any case, the sanctioning body itself remains free to pick the supplier that it believes will provide the best deal. Similarly, neither the lengthy duration of the Hoosier contracts nor their renewal terms represent real evidence of coercion or interference. The respective sanctioning body simply may enter a contract with the tire supplier of its choice. If anything, the actual terms contained in Hoosier's form contract appear to be completely consistent with what one would actually expect to find in an exclusive supply arrangement.[2]

---

[2] We also do not overlook the fact that it is the racers and the drivers that ultimately purchase the racing tires. Unlike in Dentsply and LePage's, we accordingly are not dealing with the case of a supplier entering exclusive arrangements with retailers, which purchase the products at issue for resale to the ultimate

## 2.Benefits and Justifications of the Single Tire Rule

Initially, the Court agrees with the position of the amici that motorsports sanctioning bodies, as well as similar organizations in other sports, deserve a bright-line rule to follow so they can avoid potential antitrust liability as well as time-

---

customers. It is undeniably troubling that the evidence in the record indicates that the interests of at least some of the racers, drivers, and others have evidently diverged from the interests (and actions of) the governing sanctioning bodies. For instance, more than one thousand racers, drivers, and other industry participants have actually signed STA's "Declaration in Favor of Competition," attacking the single tire formula as a monopolistic practice and calling for its replacement. On an even more basic level, it appears clear that, the more a tire supplier offers a sanctioning body in terms of financial support, the more the racers and drivers have to pay for the tires themselves. At the very least, such circumstances further complicate this case, providing at least some support for STA's antitrust claims against Hoosier and DMS.

We, nevertheless find that such considerations ultimately do not assist STA. As already noted, the financial contributions do ultimately benefit the actual tire purchasers, either directly in the form of point funds or indirectly by providing the financial resources allowing the sanctioning bodies to function and hold the races in the first place. Furthermore (and as explained in more detail in Section III.B.3, *infra*), the purchasers otherwise remain free to "vote with their trailers" by not participating in a sanctioning body's races because of its adoption of a single tire rule or its entry into an exclusive deal with Hoosier. We further add that no racer or driver has actually joined STA as a Plaintiff in this litigation or otherwise filed an amicus curiae brief in its favor.

consuming and expensive antitrust litigation. In fact, this current lawsuit is the *second* federal antitrust case brought against Hoosier arising out of the single tire rule. In M & H Tire Co. v. Hoosier Racing Tire Corp., 733 F.2d 973 (1st Cir. 1984), the First Circuit rejected an antitrust challenge by a tire supplier, M & H, to the adoption of such a rule by several race tracks and driving clubs as well as their entry into an exclusive contract with Hoosier. Id. at 974-89. Likewise, there have been other antitrust lawsuits challenging the adoption of racing equipment rules of various kinds. See Brookins v. Int'l Motor Contest Ass'n, 219 F.3d 849 (8th Cir. 2000) (transmission rule); STP v. U.S. Auto Club, Inc., 286 F. Supp. 146 (S.D. Ind. 1968) (engine specification rule). While the sanctioning body defendants ultimately prevailed in all three cases, see Brookins, 219 F.3d at 852-55; STP, 286 F. Supp. at 171, it has undoubtedly come at considerable expense. Contrary to the pro-competitive purposes of antitrust law, this expense may have a very real anti-competitive effect, especially on the smaller sanctioning bodies. Furthermore, if the Court fails to adopt a relatively clear rule here, motorsports sanctioning bodies, in the apt words of the amici, "will have to chart a narrow, and perhaps unsustainable, course, between (1) the Scylla of anti-competitive, expensive, and unsafe rules and (2) the Charybdis of the optimum rules for the sport accompanied by potential antitrust litigation and exposure, including the crippling expense in defending their legitimate right to promulgate their own rules." (Amicus Brief at 9-10.) Nevertheless, we must be careful not to establish an overly broad rule detached from the specific facts now before us, especially in light of the highly fact-specific nature of the antitrust standards themselves.

Accordingly, sports-related bodies should be given leeway with respect to their adoption of equipment requirements as well as their related decision to enter exclusive contracts with the respective suppliers. As highlighted by the racing case law cited above, it appears that the courts have generally accorded sports

41

organizations a certain degree of deference and freedom to act in similar circumstances. See, e.g., Am. Needle, Inc. v. NFL, — S. Ct. —, 2010 WL 2025207 (May 24, 2010) (exclusive football headwear license); McCormack v. NCAA, 845 F.2d 1338 (5th Cir. 1988) (NCAA football eligibility rules); Gunter Harz Sports, Inc. v. U.S. Tennis Ass'n, Inc., 665 F.2d 222 (8th Cir. 1981) (per curiam) (prohibition of double-strung tennis rackets); Hatley v. Am. Quarter Horse Ass'n, 552 F.2d 646 (5th Cir. 1977) (definition of "quarter horse"); Deesen v. Prof'l Golfers Ass'n, 358 F.2d 165 (9th Cir. 1966) (PGA eligibility rules); Toscano v. PGA Tour, Inc., 201 F. Supp. 2d 1106 (E.D. Cal. 2002) (same). Even STA appears to acknowledge that such organizations are entitled to some *deference*. However, the standard it offers, requiring, inter alia, that the rules be adopted by a neutral and unbiased body and that they do not result in any significant market foreclosure, does not seem very deferential. Among other things, such an approach would preclude sanctioning bodies from entering into an exclusive equipment contract with a supplier that already has a high share of the relevant geographic or product markets.

We further believe that a deferential and bright-line approach is especially appropriate in light of the practical restraints faced by the sanctioning bodies in this case. Even though they may, among other things, receive significant financial support from the suppliers, DMS and the other sanctioning bodies do not have unfettered discretion in adopting rules, entering exclusive arrangements, or imposing higher equipment costs on the racers and drivers. It is well established that the sanctioning bodies compete for racers and drivers, and these racers and drivers in turn are more than able to, in the words of amici, "vote with their trailers." (Amicus Brief at 14.) Fewer racers and drivers mean less for the sanctioning body in terms of the entry fees charged to the participating racers and drivers themselves as well as a possible decrease in the number of tickets and revenues earned from concessions and other

42

sources of money (at the very least because the friends and families of non-participating racers and drivers would be much less likely to attend). In turn, this can lead to a "death spiral" because lower gate receipts and other forms of revenue mean lower prize purses, which means less interest among racers and drivers, which results in even less revenue to the sanctioning body, and so on. Ultimately, the sanctioning bodies which consistently make the wrong business decisions face the prospect of going out of business. They, like other kinds of businesses, also have no long-term interest in the creation of a monopolist in their own supply chains. If Hoosier actually were a monopolist, not only could it charge racers and drivers whatever it wanted for tires, it could also reduce its monetary payments to the sanctioning body or eliminate such support altogether. See, e.g., Menasha, 354 F.3d at 663 ("Why would these entities shoot themselves in the feet by signing (retailers) or favoring (manufacturers) exclusive contracts that entrench [the defendant] as a monopolist that then can apply the squeeze."). Finally, the fact that not all races are governed by single tire rules shows that the sanctioning bodies can and do recognize that not all forms of racing in all parts of the country are identical and that such bodies are more than able to adopt the rule that best advances the particular kind of racing at issue.

This Court therefore approaches the actions of DMS and the other sanctioning bodies with a degree of deference and we adopt the following general rule: the Sherman Act does *not* forbid sanctioning bodies and other sports-related organizations from freely (i.e., without any coercion or improper interference) adopting exclusive equipment requirements, so long as such organizations otherwise possess, in good faith, sufficient pro-competitive or business justifications for their actions. At the same time, we wish to make it clear that we are not granting any kind of antitrust immunity. Cf., e.g., Am. Needle, — S. Ct. —, 2010 WL 2025207, at *11 n.7 (attacking Seventh Circuit concerted action ruling for, inter alia, "carv[ing] out a zone of

43

antitrust immunity for conduct arguably related to [NFL] league operations by reasoning that coordinated team trademark sales are necessary to produce 'NFL football'"). For instance, we are not confronted with a situation in which the sanctioning body offers absolutely no justification whatsoever for its actions or its justifications are offered in bad faith or are otherwise nonsensical. Instead, we will affirm the District Court's ruling because there are several good faith justifications for the sanctioning bodies' single tire rule.

We acknowledge that STA vigorously attacks the single tire rule itself, arguing that there were less restrictive alternatives. According to STA, there are, at least, genuine issues of material fact with respect to each and every benefit and justification offered by Hoosier, DMS, and the amici in support of the rule itself. To a certain degree, such a vigorous if understandable attack actually serves to highlight our reluctance to second guess the decisions made by a sanctioning body regarding the basic rules and guidelines of its sport. In fact, STA's extensive challenge to the single tire rule constitutes an attack on the very raison d'etre of the sanctioning bodies, which exist in order to set certain ground rules and then run races in conformity with such rules. In any case, we agree with the District Court that the sanctioning bodies have properly adopted the single tire rule because they believe such a rule creates more exciting races, ensures equal access to a uniform product, leads to increased safety, and lowers the costs of tires by eliminating the so-called "tire wars."

In fact, STA's whole challenge to the single tire rule has a simple yet serious flaw. It was *STA* that actually pioneered and promoted the whole idea in the first place. STA's own website claimed credit for promoting "spec tire or track rules," in which "track owners and promoters adopted a manufacturer's tire for a particular class of races for the duration of a racing season." (A484.) In turn, it claimed that such a rule had several benefits,

44

including the avoidance of constant and costly tire changes and the encouragement of parity between racers and drivers, and that its adoption even contributed "to the success and popularity of dirt track racing in America." (Id.) Jacobs actually defended the rule as part of the M & H litigation. More recently, STA's general manager, Mateer, testified at his deposition in this litigation that limiting the number of tires bought by racers could be good for the sport itself and that a single tire rule also could reduce costs. Further acknowledging STA's own role in developing the rule, Mateer added that it was created in order "[t]o eliminate the constant in-season product development that was requiring the racers to buy every trick new tire that came along." (A833.)

We recognize that STA has turned against the rule itself, at least as in its more recent form. In turn, it attempts to explain its prior support for the rule and how Hoosier has usurped and distorted the rule into an anti-competitive tool. STA certainly has a right to change its position, but the past support provided for the rule now challenged in this litigation cannot be overlooked so easily.

In any case, even setting aside STA's prior conduct, the record here clearly establishes that there are more than ample justifications for the single tire rule. DMS specifically discusses in some detail the statements made by *eleven* separate individuals regarding the various benefits arising out of a single tire rule. For instance, Driggers, who serves as the racing director for DMS, explained in some detail how the car counts increase under a single tire rule. Likewise, the sanctioning body's president, Deery, indicated that these equipment rules have long been recognized as a "cornerstone" of motor racing. (A1931.) Specifically defending the single tire rule, Deery asserted that "spec tires save money, provide a level field, are safe, and make for a more successful show." (A1934.)

45

In the end, we recognize that STA and others have serious issues with the single tire rule, at least in its current form. They otherwise remain free to argue that such a rule and the related exclusive contracts harm both the competitive process and the sport of dirt oval track racing. In fact, the racers and drivers themselves are free to "vote with their trailers" by not participating in races conducted under a single tire or Hoosier-only rule. Following the District Court, we nevertheless find that DMS and the other sanctioning bodies possess good faith justifications, amply supported in the record, for adopting a well-established rule actually developed and defended by STA itself. In such circumstances (and in the absence of any coercion or improper interference on the part of the respective suppliers), such sports-related organizations should have the right to determine for themselves the set of rules that they believe best advance their respective sport (and therefore their own business interests), without undue and costly interference on the part of courts and juries.

3. Antitrust Injury

We next come to the question of antitrust injury and standing. To establish antitrust injury, a plaintiff must show harm to competition, not just harm to the plaintiff competitor. See Brunswick Corp., 429 U.S. at 488. We agree with the District Court that STA does *not* satisfy this requirement.

It is well established that competition among businesses to serve as an exclusive supplier should actually be *encouraged*. See, e.g., Menasha, 354 F.3d at 663 (recognizing that competition to become exclusive supplier "is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress" (citation omitted)). In Section III.B.1, supra, this Court explained in some detail how the sanctioning bodies are free to adopt a single tire rule and then contract with the supplier of their choice without any undue

46

interference or coercion on the part of Hoosier. Our focus now shifts to whether STA has been able to compete for this business.

We acknowledge that the process used by the various sanctioning bodies has too often been less than perfect. The District Court partly recognized as much, noting that the sanctioning bodies may elect to dispense with sending out a formal RFP to the various tire suppliers. In fact, DMS did not select its tire suppliers through a formal bidding process prior to the start of this litigation, and it evidently did not possess specific procedures or protocols for selecting a tire supplier. We similarly continue to be troubled by certain other aspects of the process used to select a supplier, especially the fact that tire suppliers provide financial support to the sanctioning bodies, even though such bodies do not actually purchase the tires. See, supra, n.2.

Nevertheless, the record here clearly establishes the existence of *competition* on the part of the remaining suppliers for the valuable right to serve as an exclusive provider of tires. Accordingly, the District Court properly recognized that the suppliers themselves are generally well aware of what is going on in the marketplace, and they actually have been able to take business away from their competitors over the years. For instance, STA has continued to respond to RFPs from the various sanctioning bodies, and it has also attempted to win an exclusive contract even in the absence of a formal proposal from the sanctioning body itself. We note that STA evidently has had some success in this market, especially in the past. In fact, it has served as the exclusive tire supplier for a number of sanctioning bodies.[3]

_____

[3] We specifically note that: (1) from the 1980s to approximately 2005, IMCA required its cars to use the G-60 American Racer tire manufactured by STA; (2) in 2006-2007, STA responded, without success, to an RFP for an exclusive tire contract sent out by WISSOTA; (3) although there was no

In the end, STA never suffered the kind of injury that gives rise to an antitrust claim. On the contrary, it has had the clear opportunity to compete and did compete, sometimes successfully, for the exclusive tire contracts. See, e.g., NicSand, Inc. v. 3M Co., 507 F.3d 442, 456 (6th Cir. 2007) (en banc) ("When one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury." (citation omitted)); U.S. v. Aluminum Co. of Am., 148 F.2d 416, 430 (2d Cir. 1945) (Hand, J.) ("The successful competitor, having been urged to compete, must not be turned upon when he wins."). Accordingly, the District Court was correct to grant summary judgment in favor of Hoosier and DMS

formal RFP, STA submitted a proposal to ASCS in 2007, in which it offered a financial contribution in exchange for exclusivity; (4) STA submitted a bid in response to USAC's RFP, although its bid, among other things, did not propose exclusivity; (5) an STA distributor won the bid to be UMP's exclusive tire supplier for certain races in 1994 but was then outbid by Hoosier in 1995; (6) after the filing of this lawsuit, STA responded with seemingly non-exclusive and ultimately unsuccessful bids to 2007 and 2008 RFPs from DMS; and (7) Lias Tire, an STA distributor, won an exclusive agreement with URC and further agreed to pay this sanctioning body $14,500.00 to be the single tire at approximately thirty (30) events.

Furthermore, Hoosier and DMS should not be held legally accountable for STA's recent pattern of submitting "non-exclusive" bids to the respective sanctioning bodies, even after the sanctioning bodies expressed a desire for an exclusive relationship.

48

because of this failure to meet the antitrust injury requirement.[4]

## C. The Denial of the Motion for Leave to Amend

Finally, this Court must consider whether the District Court properly denied STA's request for leave to amend its complaint in order to add an express refusal to deal or group boycott claim to the five substantive causes of action it had already alleged. We find that the District Court did not abuse its discretion by rejecting a last-minute attempt to amend a pleading for the *fourth* time.

Given the fact that this motion was filed sometime after the expiration of the May 30, 2008 deadline stated in the District Court's own scheduling order, the District Court purportedly applied the "good cause" standard of Federal Rule of Civil Procedure 16(b)(4) (providing that "[a] schedule [set forth in a scheduling order] may be modified only for good cause and with the judge's consent"), as opposed to the more liberal approach to amendments established in Federal Rule of Civil Procedure 15(a)(2) (providing that "[t]he court should freely give leave when justice so requires"). It further stated that, unlike Rule 15(a)(2) and its focus on the question of prejudice to the non-moving party, Rule 16(b)(4) focuses on the moving party's burden to show due diligence. While the District Court indicated that we have yet to address this tension between Rule 15(a)(2) and Rule 16(b)(4), STA acknowledges on appeal that it had the burden to demonstrate good cause and due diligence (and the District Court itself ultimately found that the proposed amendment would in fact prejudice the other parties).

The District Court properly denied leave to amend. According to STA, it could not have discovered the key facts

---

[4] All six of STA's claims, including STA's illegal tying claim, were properly dismissed on this ground.

supporting this new claim until it reviewed "hundreds of thousands of late-produced documents," which were not provided until after the deadline to amend had already passed. (Appellants' Brief at 57.) In turn, STA specifically takes issue with: (1) the District Court's statement that "'it is not easy for the Court to discern when Plaintiffs were, or should have been, aware of the basis for the group boycott claim;'" (2) the District Court's reliance on STA's failure to amend the scheduling order to seek more time for discovery (arguing that such a failure actually highlighted STA's own diligence); and (3) the District Court's finding of prejudice (on the grounds that STA never requested any additional discovery in its motion to amend). (Id. (citation omitted).) On the other hand, as a practical matter, it bears repeating that this was the fourth time that STA desired to amend its complaint in this already very complicated and highly contentious litigation, in which STA had already alleged multiple theories of relief. Furthermore, STA evidently informed the District Court that, "during an October 29, 2008 deposition of Hoosier's sales manager, Paul Mentink, Plaintiffs learned that the 'Hoosier-only' rules known as the 'national sprint tire' rule . . . . originated from a July 2006 Sprint Summit meeting in Pittsburgh arranged by [DMS]." (A7 (citation omitted).) The District Court then, quite reasonably, noted that: (1) the original complaint actually included an attached copy of the December 15, 2006 statement by Hoosier announcing the creation of a new sprint car tire at the request of several sanctioning bodies and tracks; and (2) the previous complaints expressly alleged that Hoosier agreed with multiple sanctioning bodies to develop a new sprint tire that the sanctioning bodies would use in their races. The District Court also understandably wanted this complicated case to move forward to its ultimate resolution. In any case, any attempt to add a new claim would be moot given our ruling on the merits of STA's existing claims. Therefore, we are unable to find that the District Court abused its discretion here.

50

## IV.

For the foregoing reasons we will affirm the District Court's rulings in favor of Hoosier and DMS.