Mr. Chief Justice Marshall
delivered the opinion of the Court.
Both parties in this cause claim under grants made by the United States, in that tract of country which was reserve by Virginia, out of her cession to Congress, for the purpose of satisfying the claims of her officers and soldiers on continental establishment. The reserve was at first dependent on a deficiency of good land, to satisfy -ct-hose claims, in a territory reserved for the same objects in Kentucky, which was then a part of Virginia; but the necessity of making this fact appear, was afterwards dispensed with, and the deficiency was admitted to exist. The plaintiff, haying the oldest patent, has, of. course, the better title, if his patent be valid.
A case was agreed in the Circuit Court, on which a pro forma judgment was rendered for . the defendant, which is now before this Court on a writ of error.
*471 The plaintiff claims under a military warrant, issued to one of the officers of the Virginia line, on continental establishment; and the defendant, under a purchase made from the United States, subsequent to the emanation of the plaintiff’s grant. The first question made in the cause is, whether the land in controversy be within the Virginia reserve.- The words are, that if the quantity of land reserved, on the south-east side of the Ohio, “ for the Virginia troops on continental establishment, should , prove insufficient Tor their legal bounties, the deficiency should be made up to the said troops, in good -lands between the Scioto and Little Miami.”
In 1790, Congress parsed an act,a in which, after reciting that the agents for ,the troops of Virginia had reported„ to the Executive of that State, that' there was a deficiency of good lands in the territory Reserved on the south-east of the Ohio, and,. after directing the Secretary of War to make a return to the Executive of that State of the number of officers, non-commissioned officers, and privates^ who Served in the Virginia line on continental establishment, it is enacted, “ that it shall and may be lawful for the said agents to locate, to and for the use of the said troops, between thé rivers Scioto and Little Miami, such a number of acres of good land, as shall, together with the number already located between the said two rivers, and the number already located on the South-easterly side of the river. Ohio, be equal to *472 the aggregate amount so to be returned, as afore-saidj by the Secretary of the Department of War.”
In June, 1704, Congress passed another acta on this subject, declaring that every officer and. soldier of the Virginia line, on continental establishment, entitled to bounty lands, between the Scioto and Little Miami rivers, “ shall, on producing -the. warrant, or a certified copy thereof, and a certificate under the seal of the office where the said warrants are legally kept, that the same, or a part thereof, remains unsatisfied; and on producing the survey, agreeably to the laws of Virginia, for the tract or tracts to which he or they may be entitled, as aforesaid, to the Secretary of the Department of 'War, such officer and soldier, his or. their heirs or assigns, shall be entitled to, and receive-a patent for the same, from the Prqsident of the United States.”
Under these acts the plaintiff's patent was issued: It is not, we think, to be questioned, that, undér the reserve contained in the cession act of Virginia, and under the acts óf Qongress .which have been recited, the whole country lying between the Scioto and Little Miami was subjected. to the military warrants, to satisfy which the reserve was made, and any part of it might be surveyed foir any person holding such warrant, What is the extent of this country ?
The plaintiff contends, that it is the territory between the Ohio, into which both rivers empty, and aline tó be drawn from the source of the main *473 branch of one river to the source of the main branch of the other, and the rivers themselves, from their sources to their mouths.
The Scioto is a much longer river than the Little, Miami, and the defendant has suggested, that the country reserved may be limited by the Ohio on one side, and a line drawn from the source of the Miami to the Scioto, which shall be parallel with the Ohio, on the opposite side. But this suggestion has not been pressed ; and the idea it conveys, is directly opposed to the words of the reserve, and the construction which has been uniformly given to the deed of cession by both the contracting parties. The territory lying between two rivers, is the whole country, from their sources to their mouths; and if no fork of either of them has acquired the name, in exclusion of another, the main branch, to its source, must be considered, as the true river. Any other , rule would be arbitrary, depending on caprice, not on principle ; and the whole legislation of Congress upon the subject shows, we think, a disposition to be guided by this reasonable rule.
We are relieved from the inquiry respecting the main branches, of these rivérs, by the case agreed, which finds a map, certified by the commissioner of the land office, dated the 26th of February, 1820; and that a line on the said map, marked and thereon described as Roberts’ line, represents a line extending from the source of the Little Miami to the source of the Scioto, and that the sources of both rivers are truly shown thereon.
Admitting this line to con itute the true boun^ *474 dary of the military reserve, the land in controversy lies within it; and the plaintiff’s patent would, consequently, be valid, if it depended entirely on the, original deed of cession, and the acts of Congress which have been recited. But the defendant’s counsel contends, that as the plaintiff’s title was to be derived from the government, of the Union, it must have been obtained conformably to the laws of the United States,, or. is invalid.
It has been very truly observed, that, while the government of. the Union is to be considered as holding the territory ceded by Virginia, in trust for the officers arid soldiers of the Virginia line, so far as the reservation for'their benefit extends, it is also to be considered as holding the lands not reserved, in trust.for the nation; and as being bound by its high duties to execute that trust. Congress, therefore, found it necessary to provide for the sale, of the territory not included within the reserve ; and its laws made for this purpose may control, arid .have controlled, the original rights of the military claimants, and have established a line between thé sources of the Scioto and Little Miami, different from that for which the. plaintiff contends.
' Without questioning the power of the government, the Court will proceed to inquire whether Congress has passed any law, contracting the military reserve within narrower limits than are prescribed b^r the deed of cession, as herein construed^, or has made any provision which, in any manner,affects the plaintifFs grant.
In May, 1785, Congress passed “ ari ordinance for ascertaining the mode of granting lands in the *475 western territory,” in which; for the purpose of securing to the officers and soldiers of the Virginia line, on continental establishment, the bounties granted them by that State, it is ordained, “that no part of the land between the rivers called Little Miami-and Scidto, on the north-west side of the river Ohio, be -sold, or in any manner alienated, until there shall first have been laid off and appropriated for the said officers and soldiers, and persons claiming under them, the lands they are entitled to, agreeably to. the said deed of cession, and act of Congress accepting the same.”
In May, 1796, Congress-passed an acta for the survey and sale of these lands, directing the appointment of a Surveyor General, whose duty it should-be “to survey and mark the unascertained outlines of the lands lying north-west of the river Ohio, and above the mouth of the river Kentucky, in which the titles of the Indian tribes have been extinguished, and to divide the same in the manner hereinafter directed,”
The 2d section enacts, “ that the part of the said land which has not been already .conveyed,” &c., “ or which has not been heretofore, and during the present session of Congress may not be, appropriated for satisfying military land bounties, and for other purposes, shall be divided',” &c.
This law, then, which gives to the Surveyor General his authority to survey the country generally, and to lay off the lands as prescribed in the act, excludes from this general authority all lands pre *476 Viously. appropriated for military land .bounties, and for Other purposes; and, consequently, excludes the lands between the Scioto and the Little Miami.
In May, 1800, Congress passed an acta providing further for the sale of these lands, and establish^ ing for that purpose, four land offices. The places at which these offices shall be fixed are designated in the act, atid the district, of Country attached to each, is described. Neither of these districts comprehends, any lands between the. Scioto and the Little Miami. The Surveyor General was not authorized to survey any lands within the military reserve, norwas the sale of such lands, authorised at any of the land offices. In. the execution of this.act, the Surveyor General caused a line to be run from the source of the Little Miami towards whát he supposed to bé the source of the Scioto, which is denominated Ludlow’s line; and surveyed the lands west of that line in .sections and parts of sections as prescribed in the act of Congress.
In March, 1804,b Congress passed a law for ascertaining the boundary of the land reserved by the State of Virginia for military bounties, which enacts, “ that the line run under the. direction of the Surveyor General of the United States, from the source of the Little Miami towards the source of the Scioto, and which binds, on the east, the surveys of the lands of the United States, shall, together with its course continued to the Scioto river, be Considered and held as the westerly boun *477 dary line, north of the source of the Little Miami, of the territory reserved by the State of Virginia, between the Little Miami and the Scioto rivers, for the use of the officers arid soldiers of the continental line of that State : Provided, that the State of Virginia shall, within two years after the parsing of this act, recognise such line as the boundary of the said territory.” The line mentioned in this act, is called, Ludlow’s line.
This act shows, we think, very clearly, that Congress did not mean to assert a power to fix the western boundary of the military reserve. The deed of cession, and the act of acceptance, were considered as forming a contract respecting a territory, the western line of which could not, at the time, be fixed with precision, and which was unavoidably described in terms requiring subsequent explanation and adjustment. This adjustment was to be made, not by one of the parties, but by both; and this.act is an essay towards it. Congress makes a proposition to Virginia, by which the United States are to be bound, provided Virginia accepts it within two years. If it be not accepted within that time, the parties stand on their original rights, as if.it had never been made. This is a very fair and - equitable proceeding on thé part of.the government, and is founded on the idea that the rights of the parties are equal. Had Virginia accepted this proposition, it would have become a contract, and Ludlow’s line would have been established as. the western boundary of. the military reserve; the land in controversy lying west of that line, would not have béen’ liable to be surveyed to satisfy the plaintiff’s war *478 rant. But. Virginia did not accept the proposition, and the rights, of the parties remained as if it had never been made.
In 1812,a Congress made another effort to establish this Une. The President was authorized to appoint three commissioners, to meet commissioners to be appointed by Virginia, who were'to agree on the western line of the military reserve, and to causé the sámelo be surveyed and marked out. Should commissioners from Virginia fail to meet them, they were to proceed alone, and make their report to the Executive. In the. mean time, .and until the line should be established by consent, Ludlow’s line was to be considered as constituting the western boundary of the Virginia reserve.
The commissioners of the United States were met by those of Virginia, and they proceeded to ascertain the sources of the two rivers, and employed.a Mr. Charles Roberts to survey and mark a line, from the source of one to that of the other. This line is called Roberts’ line, is reported by the commissioners to the Executive, and is found, in the case agreed, to represent truly a line drawn from the source of the Little Miami to the source of the Scioto. The Virginia commissioners, however, refused to accede to this line, arid claimed to run, from the source of the Scioto, a straight line to the mouth of the Little Miami, which would pass south of that river, and include a considerable tract of country not lying between that river and the Scioto. This demand prevented an agree- *479 went establishing Roberts’ line; and as the act of June, 1812, provisionally designated . Ludlow’s line as the western boundary oí ,the reserve, until one should be finally established, with the consent .of Virginia, it remains-the boim-biry for the present. Had the plaintiff’s title been acquired subsequent to the . passage of .this act, there would be. much force in the objection to it; but if was acquired before this act passed, and cannot, wc think, be affected by it. Congress cannot have intended to annul, by a legislative act, a title which was valid at the time; and a law which does not express that intention ought not to have that effect given to it by .construction. If-the words of the act of 1804 were doübtful, which they are not, the act of 1812 would expound -them, and show that not even a temporary boundary had been. pre-\ viously fixed- The appointment of commission" ers to meet others to be appointed by Virginia, who were to agree upon and mark the true line, and the establishment of a temporary line till such agreement should be made, prove incontestably, that Congress did not suppose theiine to be established. Had the commissioners troin Virginia assented to the equitable proposition -marie by thosje of the United States, the plaintiff's patent, founded on a survey made before that time, would he admitted to be unassailable. . -And ye.t the. land was, in fact, within the territory actually reserved at the . time the survey was made, and no law had then passed substituting any Other line for the true one. The act of 1812 does not look back, and annul, existing titles; it is entirely prospective, asid leaves *480 prior titles as it found them. If, then, there be no other act of Congress, which impairs this patent, it must be considered as valid.
The defendant contends that there are previous acts, by which the land between Rudlow’s and Roberts’ lines was withdrawn from the territory liable to be surveyed for military warrants. The act of 1804, already mentioned, enacts, “ that all officers and soldiers, or their legal representatives, entitled to bounty lands within the above men-, tioned reserved territory shall complete their locations within three years after the passing, flf this act,” and that the locations made within that part of the territory to which the Indian title has been extinguished, shall be surveyed, and the surveys returned to the Department of . War, within five years. The 3d section provides, that such parts of the territory as shall not have beén located, and such part as shall not have been surveyed, and the surveys returned to the Department of MTar, within the. times prescribed by the act, shall be released from any claim. for such bounty lands, and shall be disposed of in conformity with the laws passed for that purpose.
In March, 1807, an act passed, giving three years farther time for making locations, and five years farther time for making and returning surveys; “ Provided, that no locations, as aforesaid, within the above mentioned tract, shall, after the passing of this act, be made on tracts of land for which patents had previously been issued, pr which had been previously surveyed; and any patent which may nevertheless be obtained, for *481 land located contrary to the provisions of this section, shall be considered as null and void.”
The time for making locations and surveys was farther extended, by subsequent acts containing the same- proviso.
The defendant contends that this proviso comprehends the land previously surveyed by the Surveyor General of the United States.
We do not concur in this opinion, for several reasons.
The words refer to the whole military reserve, and seem intended to apply to surveys which might be made throughout that entire tract of country, not to the land surveyed in townships, sections, and parts of sections, by the United States, west of Ludlow’s line. There were such surveys. The records of this Court show, that many controversies were produced in that country, by the mode of locating and surveying, military lands, which had been adopted under the laws' of Virginia; and it is not unreasonable to suppose, that Congréss, when giving farther time to make locations and surveys, might be disposed to cure the defects in titles already acquired, and to prevent second locations on lands already located. The words of the proviso too are adapted to the saving of private rights.
It has great influence, we think, on this question, that if the proviso be construed to comprehend the surveys made by the United. States, it would amount to the establishment of Ludlow’s. line; for those surveys were made up to that line, and would indirectly curtail the Virginia military *482 reserve. This Was obviously not, at that time, the intention of the government. Subsequent to this périod, in 1812, commissioners were appointed for the purpose of agreeing with those of Virginia on the true line, and marking it; who' were directed “ to note the intersections, if any, of said line with any surveys heretofore authorized by the United States,” Congress was induced lo give farther time for making these locations and surveys, by a just sense of the real difficulties attending the completion of titles in that country, and an equitable regard for the rights of the claimants. There can be no reason to suppose that it was intended to withdraw one part of the country from these claims more than, another.
If this intention had existed, it would have been manifested in more intelligible and direct words. Instead of the ambiguous language used in this proviso, all locations would have been restrained beyond Ludlow’s fine; Congress would have avowed its intention in plain terms, and would have effected its object by direct means. But the course of legislation which has been pursued on this subject, the scrupulous regard which the government has shown, to the conditions on, which the cession of, Virginia was made, the liberal and faii offers of the United States, for adjusting, the real, extent of the reserve, forbid a construction which would indirectly abridge that reserve.
But were it to be admitted that the proviso does comprehend the lands between the lines surveyed by Roberts and Ludlow, thát admission could inot affect this cause. The words of the proviso áre, ‘‘ that no locations shall be made on tracts of land. *483 for which patents had been previously issued, or which had been previously surveyed.” The prohibition respects future locations, hot future surveys; and the case does not show when this location was made. It might have been made previous to the passage of the act of 1807; and the presumption of law. is, that it was made before that time, since the patent is presumed to be valid, until the qontrary is shown.
On both points, the Court is of opinion that the law upon this case is for the plaintiff, and that the judgment of the Circuit Court, in fávour of the defendants, must be reversed, and judgment entered for the plaintiff.
Judgment reversed.

 2 U. S. L. 179.

 2 U. S. L. 440.

 2 U.S.L. 533.

 3 U. S. L. 385.

 3 U. S. L. 592.

 4 U. S. L. 455.