**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2848
_____

HOST INTERNATIONAL, INC.,
Appellant

v.

MARKETPLACE, PHL, LLC,
_____

On Appeal from United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:19-cv-02036)
District Judge: Honorable John M. Gallagher
_____

Argued September 24, 2021

Before: CHAGARES, *Chief Judge,* HARDIMAN, and
MATEY, *Circuit Judges*.

(Filed: April 27, 2022)

Thomas C. Goldstein [ARGUED]
Eric F. Citron
Goldstein & Russell, PC
7475 Wisconsin Avenue, Suite 850
Bethesda, MD 20814

Howard I. Langer
Edward Diver
Peter E. Leckman
Langer Grogan & Diver, PC
1717 Arch Street, Suite 4130
Philadelphia, PA 19103

R. Paul Yetter
Bryce L. Callahan
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, TX 77002
        *Counsel for Appellant*

Angelo I. Amador
Restaurant Law Center
2055 L Street, NW, 7th Floor
Washington, DC 20036

Gabriel K. Gillett
Kelsey L. Stimple
Jenner & Block LLP
353 North Clark Street, Suite 4500
Chicago, IL 60654
        *Counsel for Restaurant Law Center, Amicus Curiae in
        Support of Appellant*

Leslie E. John [ARGUED]
Jason A. Leckerman
Elizabeth P. Weissert
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
        *Counsel for Appellee*

_____

OPINION
_____

MATEY, *Circuit Judge*.

After winning a bid for retail concession space at Philadelphia International Airport ("PHL"), Host International, Inc. ("Host") heard a common question: "Is Pepsi okay?" Host decided that it was not and, eager to pour what it pleased, filed an antitrust action. From that most ordinary origin bubbles up the novel question of whether an exclusive beverage agreement at an airport can be challenged under the federal antitrust laws. We conclude that it cannot, because Host lacks antitrust standing and has not adequately pled a violation of Section 1 of the Sherman Act. So we will affirm the District Court's judgment.

**I.**

Host is a familiar face to travelers, operating food, beverage, and merchandise concessions at over 120 airports globally, including PHL. The City of Philadelphia owns PHL and uses a private firm, MarketPlace, PHL, LLC ("MarketPlace"), as landlord. PHL is a big operation, serving

3

more than thirty million passengers each year, and producing equally big food and beverage sales, more than $100M in 2016.

After a competitive bidding process, Host won two concession spots at PHL, planning to open a coffee shop in one, and a restaurant in the other. But negotiations between Host and MarketPlace for a lease hit a wall when MarketPlace insisted on a term allowing it to "enter into agreements . . . granting . . . third-parties exclusive or semi-exclusive rights to be sole providers of certain foods, beverages or other types of products." (App at 24.) That included a "pouring-rights agreement" ("PRA"), "granting a beverage manufacturer, bottler, distributor or other company (e.g., Pepsi or Coca-Cola) the exclusive control over beverage products advertised, sold and served at [PHL]." (App. at 24 (alteration in original)). Host balked and demanded that the PRA be left out. MarketPlace refused, and Host walked away from the deal and into federal court.

Host's Complaint sketches a "scheme to gain control over the sale of beverages at PHL" by tying the PRA to leases for commercial space. (App. at 14.) If successful, Host alleges, MarketPlace would enjoy outsized profits "at the expense of PHL consumers, competing beverage suppliers, and lessees of concession and retail space at PHL." (App. at 15.) Host also alleges that MarketPlace would receive payoffs from a "big soda company" courtesy of an exclusive pouring-rights agreement. (App. at 16.)[1] Host grounds those allegations in two

---

[1] The company's identity has since been publicly revealed as PepsiCo. While PepsiCo is not a party here, MarketPlace alleged "an exclusive third-party beverage company" as one co-conspirator for the Section 1 conspiracy claim.

theories: 1) an unlawful tying arrangement in violation of Section 1 of the Sherman Act; and 2) an illegal conspiracy and agreement in restraint of trade, another Section 1 violation.[2]

MarketPlace moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). The District Court held that Host had standing to bring its antitrust claims but granted the motion with prejudice, finding Host failed to adequately plead a relevant geographic market. Host timely appealed, and we will affirm the District Court's judgment.[3]

## II.

Surviving a motion to dismiss requires "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Further, "[w]e accept as true the factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor." *Phila. Taxi*, 886 F.3d at 338. But "we are not compelled to

---

[2] Host does not appeal the District Court's decision to decline supplemental jurisdiction over a third claim for tortious interference.

[3] The District Court had jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 4. We have jurisdiction under 28 U.S.C. § 1291. "We exercise plenary review of the District Court's dismissal of the [Complaint]," *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 338 (3d Cir. 2018) (citation omitted), and "may affirm on any basis supported by the record, even if it departs from the District Court's rationale," *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019) (citation omitted). Host also moved for an injunction, (ECF No. 50), but because we will affirm the dismissal of Host's Complaint, that motion is moot.

5

accept 'unsupported conclusions and unwarranted inferences.'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)). As a result, we draw on "judicial experience and common sense," rather than follow an attenuated chain of assumptions. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Finally, while "it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in antitrust and other complex cases," *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010), we need not "accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (cited with approval in *Twombly*, 550 U.S. at 555–56); *Iqbal,* 556 U.S. at 678–79 (quoting *Twombly*, 550 U.S. at 555).

A.     **Host Fails to Plead Antitrust Standing**

Despite the sweeping commands of the Sherman and Clayton Acts, courts have read a limit into their text.[4] So while

---

[4] About four decades ago, around 100 years after the Sherman Act became law, the Supreme Court "observed, the lower federal courts have been 'virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) ("*AGC*") (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)). But that conclusion "is inferred largely from the perception that the courts construing Section 7 between 1890 and 1914 perceived such a congressional intention and implemented it." John F. Hart,

Section 4 of the Clayton Act permits enforcement of the Sherman Act through civil suits for treble damages by "any person who shall be injured in his business or property," 15 U.S.C. § 15, courts have decided that not every person may sue. *See Steamfitters Loc. Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 922 (3d Cir. 1999) (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477 (1982)). Instead, the cause of action is subject to an additional, a-textual requirement known as "antitrust standing."[5] *See*

---

*Standing Doctrine in Antitrust Damage Suits, 1890-1975: Statutory Exegesis, Innovation, and the Influence of Doctrinal History*, 59 Tenn. L. Rev. 191, 255–56 (1992). So too with Section 4 of the Clayton Act's direct-injury rule, which "depends in turn on the proposition that the courts had adopted such a restriction between 1890 and 1914." *Id.* In other words, because courts began to stray from the ordinary best meaning of the statutes, the courts concluded their preferred reading reflected the bills passed by Congress and signed into law.

[5] A theory often "stated elliptically and without analytical precision," meaning "[m]any of the cases cannot be reconciled." A. Douglas Melamed et al., Antitrust Law and Trade Regulation: Cases and Materials 1173 (7th ed. 2018). Leaving us with "a murky and mushy analytical framework for . . . the standing of a private antitrust plaintiff." Stephen D. Susman, *Standing in Private Antitrust Cases: Where is the Supreme Court Going?*, 52 Antitrust L.J. 465, 467 (1983). *But see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126–28 (2014) (In *AGC*, "we sought to 'ascertain,' as a matter of statutory interpretation, the 'scope of the private remedy created by' Congress in § 4 of the Clayton Act . . . . Later decisions confirm that [*AGC*] rested on statutory,

*Ethypharm S.A. France v. Abbotts Labs.*, 707 F.3d 223, 232 (3d Cir. 2013) (quoting *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998)). While the name echoes the familiar formulation of Article III, the judicially imposed requirement of antitrust standing is far more limiting. *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993). So even though "'[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact,' courts must also consider 'whether the plaintiff is a proper party to bring a private antitrust action.'" *Phila. Taxi*, 886 F.3d at 343 (quoting *AGC*, 459 U.S. at 535 n.31).

Naturally, determining who is a "proper party" is complicated by a consideration of generalized concepts like "foreseeability and proximate cause, directness of injury, certainty of damages and privity of contract." *Gulfstream*, 995 F.2d at 429 (quoting *AGC*, 459 U.S. at 532–33). And so courts whipped up a list of factors:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations;

not 'prudential,' considerations." (quoting *AGC*, 459 U.S. at 529)).

and (5) the potential for duplicative recovery or complex apportionment of damages.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165–66 (3d Cir. 1993) (citing *AGC*, 459 U.S. at 545).[6] But we need not pore over the list, as one, the absence of antitrust injury, is enough to affirm the District Court's judgment.

> 1.    There is No Antitrust Injury on These Facts

"The second [*AGC*] factor, antitrust injury, 'is a necessary . . . condition of antitrust standing.' If it is lacking, [a court] need not address the remaining *AGC* factors." *Ethypharm*, 707 F.3d at 233 (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997)). We start our search there, looking for an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant['s] acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429

---

[6] Determining when to dive into this analysis is similarly murky. *Compare Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 171 (3d Cir. 2015) ("We begin with antitrust standing."), *with Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 341 (3d Cir. 2018) (addressing antitrust standing after addressing the pled antitrust violation). But rather than getting lost, courts often "assume the existence of a violation and then ask whether the . . . standing elements are shown." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 335f (4th ed. 2014). And because we can dismiss solely for lack of antitrust standing, we begin there. *See W. Penn*, 147 F.3d at 269 (affirming the district court's dismissal for lack of antitrust standing).

U.S. 477, 489 (1977). Somewhat circular, but it means the "challenged conduct affected the prices, quantity or quality of goods or services, not just [the plaintiff's] own welfare." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) (quotations omitted). All of which "aims to protect competition, not competitors," consistent with the judicial gloss on the antitrust laws. *Id.* And the injury required for antitrust standing must flow from the unlawful nature of defendants' acts. *See* 15 U.S.C. § 15(a).

Accepting Host's argument, the District Court reasoned that "the alleged antitrust injury" is "exclusion from PHL." (App. at 9.) But Host was not excluded; Host chose to walk away from the table because it did not like the lease terms MarketPlace offered. And the conclusion that Host pled a plausible antitrust injury stretches the boundaries of antitrust law too far. First, because a breakdown in contract negotiations is outside the Sherman Act's scope; second, because injury to competitors, rather than to competition, is beyond the law's sphere.

       *i.       Failure to Secure Preferred Contractual Terms is Not an Antitrust Injury*

Begin with the narrow contours of Host's claim. MarketPlace selected Host to develop retail space and offered a proposed lease. Host did not like the terms and, weighing its options, declined the offer. It is a scenario that plays out across the nation daily, in transactions big and small. But it is not an antitrust injury because competition has not been suppressed. Host has not been excluded from any market nor forced to purchase non-alcoholic beverages from anyone.

10

True, refusing to deal can sometimes establish an antitrust claim under Section 2.[7] Likewise, a group decision among competitors to boycott a firm might constitute a claim under Section 1. And a host of common law claims sounding in contract, quasi-contract, and tort could come into play. *See JetAway Aviation, LLC v. Bd. of Cty. Comm'rs*, 754 F.3d 824, 855 (10th Cir. 2014) (per curiam) (Tymkovich, J., concurring); *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 9 (1st Cir. 2004).

But Host seeks something novel: recognition that failing to contract for commercial space states a Section 1 claim. We decline that invitation. An objectionable term in a commercial agreement, without more, is not an antitrust violation because "[d]espite [Section 1's] seemingly absolute language," only *unreasonable* agreements in restraint of trade are antitrust violations under the Sherman Act. *W. Penn*, 627 F.3d at 99 (citations omitted). Host's Complaint alleges how the exclusive beverage agreement and the PRA are undesirable, but not how they are unreasonable restraints. Host surely prefers a broader set of options for its sublessees, but that does not create a duty on MarketPlace because "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,

---

[7] But only among competitors, and only if the parties have a history of dealing paired with facts suggesting "a willingness to forsake short-term profits to achieve an anticompetitive end." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 409 (2004) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)).

555 U.S. 438, 448 (2009). As a result, Host does not have an antitrust injury sufficient to confer standing.

### ii. *Host Alleges Harm Only to Itself*

Refusing to agree to a contract also cannot state a plausible Section 1 injury because it is now "axiomatic that the antitrust laws were passed for 'the protection of *competition*, not *competitors*.'" *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). Even if that axiom comes from the courts, not Congress, it is still a binding limitation on our review.

The District Court recognized, "[d]espite references of potential harm to others, . . . Host seeks remedy for its injury alone, and that injury is its exclusion from PHL." (App. at 9.) But, once again, pleading an antitrust injury requires a plaintiff to "prove that [the] challenged conduct affected the prices, quantity or quality of goods or services, not just [its] own welfare." *Mathews*, 87 F.3d at 641 (quotations omitted); *see also Eisai*, *Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403 (3d Cir. 2016) (citing *W. Penn,* 627 F.3d at 100).[8] Host

---

[8] Host's speculations do not alter that conclusion. The Complaint references, anecdotally, that a pouring rights agreement "at one airport, . . . resulted in the exclusion of three of four premium brands of bottled water." (App. at 21). And "[i]n another market study, 17% of respondents indicated it is essential that the water they purchase be natural spring water." (App. at 22.) Taking both in the light most favorable to Host, we can infer: 1) that a market study was conducted at some airport, somewhere, sometime; and 2) in a separate study, around 1.7 of every ten consumers—perhaps at airports,

"estimates [under the PRA] . . . costs at its existing units would increase by over 30%," noting, for example, "the price increase for regular non-premium water is more than 40% for a smaller serving size." (App. at 21.) But that is harm only to Host's "own welfare," which is not our focus. *Mathews*, 87 F.3d at 641. Host fails to plead facts tending to show that *consumer* prices would increase under the PRA because it does not follow that Host's costs must be passed on to consumers. The PRA might just as easily secure lower or discounted beverage prices for smaller subtenants who could not access volume discounts and decrease prices for consumers. *See Eisai*, 821 F.3d at 403 ("[E]xclusive dealing arrangements . . . can also offer consumers various economic benefits, such as assuring them the availability of supply and price stability."); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) ("[I]t is widely recognized that in many circumstances [exclusive dealing arrangements] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like—and pose no competitive threat at all.") (quoting *E. Food Servs.*, 357 F.3d at 8)). And what is more, Host is not even required to purchase non-alcoholic beverages under the PRA.

Host also contends that "MarketPlace and [PHL] have attempted to cause and have in fact caused . . . competitive harm . . . *potentially* to other lessors/sublessors at PHL, as well as to competing beverage suppliers shut out of the market under pouring rights and consumers of beverages and other products at PHL." (App. at 28 (emphasis added).) But Host's

---

perhaps not— really liked spring water. We cannot infer that the quality of non-alcoholic beverages at PHL under the PRA would not be comparable. Or much else for that matter.

13

Complaint lacks any facts alleging harm to other PHL tenants and potential harms do not suffice. To recover treble damages under Section 4 of the Clayton Act, "a plaintiff must make some showing of *actual injury* attributable to something the antitrust laws were designed to prevent," not potential injury. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 558 (1981) (emphasis added). And most importantly, competing beverage suppliers were not "shut out" of the market unilaterally; they participated in a competitive bidding process that PepsiCo simply won.[9]

Sailing a straight course through the murky waters of antitrust injury challenges courts to avoid the siren songs of illusory harm. That is why the doctrine "requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers" in the relevant market. *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) (collecting cases). Host does not and, for that reason, cannot state a claim for relief.

---

[9] It is telling that the same competitive bidding process that resulted in the PRA also awarded Host the two retail concession spaces, (App. at 24–25) a process Host agrees was competitive. (Opening Br. at 15.) Understandably, as "[i]t is well established that competition among businesses to serve as an exclusive supplier should actually be *encouraged*." *Race Tires*, 614 F.3d at 83; *see also Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 354 F.3d 661, 663 (7th Cir. 2004) (competition to be an exclusive supplier "is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress.").

**B. The Tying Claim**

While Host's failure to plead antitrust standing defeats both its Section 1 claims,[10] we note a deeper problem with using a "tying theory" on these facts. Tying refers to "selling one good (the tying product) on the condition that the buyer also purchase another separate good (the tied product)." *Race Tires*, 614 F.3d at 75 (quoting *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 385 (3d Cir. 2005)).[11]

That is not the case here. Host strains to argue that a lease provision limiting the use of MarketPlace's property forces Host's sublessees to purchase something they may not want. But we "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan*, 478 U.S. at 286). It also requires Olympic-level gymnastics to bound across the floor from a publicly bid leased space to a tying agreement. Among the leaps: Host is not "purchasing" non-alcoholic beverages (when instead its tenants might); Host is not "forced" to purchase non-alcoholic beverages (when instead the PRA only limits Host's sublessees' choice of vendors). Thankfully, "we are not

---

[10] Host also alleged that MarketPlace's conduct violated Section 1 of the Sherman Act because it constituted an unlawful restraint of trade. But because Host has not adequately alleged an antitrust injury, Host's generic Section 1 claim fails.

[11] We have viewed tying cases to implicate rule of reason analysis. *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477, 482 (3d Cir. 1992) (en banc). But because Host has not proven the existence of a tie, we need not address whether the District Court erred in not analyzing the claim under the rule of reason.

15

compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka*, 481 F.3d at 195 (quoting *Schuylkill,* 113 F.3d at 417) and can rely instead on ordinary understanding, *Iqbal*, 556 U.S. at 679. Understanding that draws on the "essential characteristic of an invalid tying arrangement," namely "the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

At bottom, Host alleges the proposed lease demands purchasing non-alcoholic beverages under the PRA. If that sounds familiar, it is, because it again recasts the PRA contract restriction as a product. But even if it were, Host would be obligated to "purchase" the tied product because of the lease agreement, not because of MarketPlace's market power over the tying product. "The flaw in this argument is that the essential element of coercion on the part of the product seller is absent completely from the facts." *Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1263 (11th Cir. 1998). If anything, that is an issue of contract law rather than antitrust law. MarketPlace's control over the non-alcoholic beverage suppliers at PHL does not stem from market power; it stems from its role as a landlord.[12] *See Queen City Pizza, Inc. v.*

---

[12] *See E. Food Servs.*, 357 F.3d at 4 ("The university, like most landlords, controls who may set up shop on its premises. It could act as the sole on-campus supplier of food and beverages, allow multiple suppliers, or give exclusive access to one supplier."); *JetAway*, 754 F.3d at 857–58 (Tymkovich, J., concurring) ("No one disputes that the Airport may control access to its own premises, . . . [and] strictly

16

*Domino's Pizza, Inc.*, 124 F.3d 430, 441 (3d Cir. 1997). Antitrust plaintiffs cannot simply frame their contract claims in a clever way to pursue treble damages.[13]

control its concessionaires and the services they supply."); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1193 (10th Cir. 2009) ("[A] resort has no obligation under the antitrust laws to allow competitive suppliers of ancillary services on its property. A theme park, for example, does not have to permit third parties to open restaurants, hotels, gift shops, or other facilities within the park.").

[13] An illegal tying scheme requires that "the seller possesses market power in the tying product market." *Town Sound*, 959 F.2d at 477. The necessary market power "is the power to force a purchaser to do something that he would not do in a competitive market" and can be "inferred from the seller's possession of a predominant share of the market." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) (quotations omitted). "[T]he court calculates the market share in the relevant product markets" from the geographic market, the "area in which a potential buyer may rationally look for the goods or services he seeks." *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005). But because Host has failed to plead that MarketPlace "forced" Host to "purchase" a separate "product," we need not address whether a single airport can constitute a geographic market. *See Town Sound*, 959 F.2d at 477. Federal courts are not economists, and we should avoid an unnecessary "ramble through the wilds of economic theory." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 609 n.10 (1972).

## III.

Contractual negotiations began the relationship between Host and Marketplace, and contract, not antitrust, is where that relationship ends. The antitrust laws prevent the consequence of an antitrust injury; they do not create one. Whatever remedy exists for Host's disappointment must lie outside the antitrust law which "is not intended to be as available as an over-the-counter cold remedy, because were its heavy power brought into play too readily it would not safeguard competition, but destroy it." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 539 (2d Cir. 1993). For that reason, we will affirm the judgment of the District Court dismissing the Complaint with prejudice.